(7 App. Div. 207)

HOPKINS v. CLARK et al.

(Supreme Court, Appellate Division, First Department. June 29, 1896.)

FACTORS AND BROKERS—RATIFYING UNAUTHORIZED PURCHASE.

On an issue as to whether plaintiff ratified an unauthorized purchase of bonds by defendant on plaintiff's account, it appeared that defendant was carrying for plaintiff an account for stock purchased on a margin, but that plaintiff had no other speculative transactions. Plaintiff testified that, shortly before the unauthorized purchase, he called at defendant's office, and requested defendant to purchase some stock of the L. Co. for him, if he had an opportunity, and that no other stock was talked of; that he distinctly told defendant that he would not speculate; and that nothing was said about purchasing any bonds; and that he gave no authority to defendant to buy anything except said stock. Defendant testified that plaintiff offered certain security for any further purchases that he might make; that he discussed the situation in stocks generally, and said that he would like to make a dollar, and that, if defendant could help him, he would like it; and that he stated during the conversation his desire to purchase stocks for a rise. The purchase in controversy was made on a Friday, and a letter from defendant announcing it reached plaintiff on Saturday, after the close of business, and he was unable to communicate with defendant until the following Monday. He telephoned defendant that he had not authorized the purchase of anything but the stock, and that he did not want to have anything to do with any speculation, but he did not expressly repudiate the transaction, and on the same day he wrote defendant. *Held*, that the evidence was not sufficient to show a ratification by plaintiff of defendant's unauthorized act. Van Brunt, P. J., and Williams, J., dissenting.

Action by Henry C. Hopkins against James F. A. Clark and others to recover $7,280, the balance of an account which plaintiff claimed

against defendants.  A judgment in favor of plaintiff for $3,379.33, and an order denying a motion for a new trial, were reversed by the general term of the court of common pleas.  36 N. Y. Supp. 456. Afterwards a reargument was granted.  37 N. Y. Supp. 1146.  The cause now comes on for rehearing.  Affirmed.

The facts are stated by Mr. Justice WILLIAMS as follows:

The action was brought to recover an amount alleged to be due and owing by defendants, as stockbrokers, to the plaintiff.  The defendants loaned the plaintiff $4,368.59, and plaintiff deposited with defendants, as collateral to the loan, 200 shares Louisville, New Albany & Chicago Railway Company stock, and 31 shares of the Oregon Railway & Navigation Company stock. The plaintiff offered to repay the loan, and demanded the return of his stock deposited as collateral.  The defendants refused to surrender the collateral upon repayment of this loan, claiming they had also advanced for the plaintiff the further sum of $4,212.50 in the purchase of $10,000 par value of Philadelphia & Reading third preference income bonds, for which they paid 42 cents on the dollar, their commission being $12.50, and that the collaterals were held as security for this indebtedness as well as the former $4,368.59. The plaintiff denied this additional indebtedness, and the issue tried related to this difference between the parties.  It was agreed that the total amount of the plaintiff's claim upon his theory, including interest, was $3,075.02, and for this amount the jury rendered a verdict.  There was a motion to dismiss the plaintiff's complaint made at the close of the plaintiff's evidence, which was denied with exception.  There was no motion made at the close of all the evidence to take the case from the jury.  No objection was made to the submission of the case to the jury.  The charge is not in the record upon this appeal.  There was a motion for a new trial upon the minutes upon the ground, among others, that the verdict was contrary to the evidence, and this motion was denied, with exception.  This raised the question which is discussed upon this appeal, and which the defendants claim calls for a reversal of the order, and the granting of the motion for a new trial.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, PATTERSON, and INGRAHAM, JJ.

Paul D. Cravath, for appellants.
Michael H. Cardozo, for respondent.

RUMSEY, J.  The action was brought to recover the balance of an account which the plaintiff claimed against the defendants.  It was conceded that for a considerable time before the month of February, 1893, the defendant Campbell had been in the employ of Brown, Riley & Co., who were brokers in the city of Boston.  During that time the plaintiff, who was a personal acquaintance and friend of Campbell, had procured to have purchased by the firm of Brown, Riley & Co. 200 shares of stock of the Louisville, New Albany & Chicago Railroad Company upon a margin; and to secure Brown, Riley & Co. he had deposited with them as collateral 31 shares of stock of the Oregon Railway & Navigation Company.  In February, 1893, there was due to Brown, Riley & Co. for their advances for the purchase of the Louisville, New Albany & Chicago stock about $4,200, while the value of the stocks held by them belonging to the plaintiff amounted to something in the neighborhood of $7,000; leaving about $3,000 apparently due to the plaintiff.  In the early part of February, 1893, Campbell severed his connection with Brown, Riley & Co., and became a partner in the firm of Clark, Ward & Co., the present defendants, and the account of the plaintiff

was transferred by Brown, Riley & Co. to Campbell's new firm, who paid to Brown, Riley & Co. the amount due on the stocks, and held them for the plaintiff, as the former firm had done. It appears that these 200 shares of stock which were bought upon a margin by Brown, Riley & Co. for the plaintiff had been carried by them for a long time, and it is fairly to be inferred from the testimony that it was the only speculative transaction which they had had in behalf of the plaintiff. The plaintiff testifies that he was induced to buy this particular stock upon speculation, because Mr. Campbell was a director of the company, and had advised him to buy it; and that he bought it and carried it upon the faith of Campbell's recommendation. He says that he had no other speculative transaction, and this is not denied by Campbell, and must be assumed to be the truth of the case. On the 17th of February, 1893, the firm of Clark, Ward & Co. advised the plaintiff that they had on that day purchased for him 10,000 income bonds of the Philadelphia & Reading Railroad Company, for which they had paid $4,200. The day on which this purchase was made was Friday. The letter announcing it reached Philadelphia, where the plaintiff was, on Saturday, and he received it on the afternoon of that day, too late to communicate with the defendants with regard to the transaction. The plaintiff claims that the transaction was not authorized; and, after some communication with the defendants about it, which will be referred to later, he made a demand upon them for the amount of money which he claimed to be due to him after crediting him with the 200 shares of Louisville, New Albany & Chicago Railroad Company stock and the Oregon Railway & Navigation Company stock; and upon their refusing to pay the amount he brought this action to recover it. The defense set up is that the defendants had purchased the Reading bonds; that such purchase had been authorized by the plaintiff, or was subsequently ratified by him; that the result of the purchase was a loss, so that in fact there was nothing due to the plaintiff as a balance upon the stocks which the defendants held on his account. Upon the trial in the court of common pleas the plaintiff had a verdict for what was conceded to be due him if the purchase of the Reading bonds was not authorized, or had not been ratified. A motion for a new trial was made upon the ground that the verdict was against the weight of evidence, which was denied by the learned justice who presided at the court, and judgment was thereupon entered for the plaintiff. From that judgment, and the order denying a motion for a new trial, this appeal was taken.

It is apparent that the questions which must be decisive of this case are whether there was original authority given by the plaintiff to the defendants, through Campbell, to purchase the Reading bonds on his account, or, if no such authority was given, whether that purchase was subsequently ratified. Just what questions were submitted to the jury by the trial judge does not appear in the record, because the charge is not printed; but we have a right to assume upon this appeal that the defendants had no fault to find either with the questions which were submitted or with the manner of their submission. It is fairly to be assumed that the

two questions which are indicated above, and which lay at the foundation of the case, were submitted to the jury, and properly so; and the question to be decided here is whether the evidence warranted a finding by the jury in favor of the plaintiff upon each of those questions. So far as the parol testimony is concerned, but two witnesses were sworn,—the plaintiff on his own behalf, and Campbell on behalf of the defendants. Both agreed that shortly before the 17th of February, 1893, the plaintiff called upon Campbell at the office of the defendants in the city of Boston, and that there took place a conversation with regard to the business transactions between the defendants' firm and the plaintiff. As to what was said at that time the parties are sadly in conflict. The plaintiff says that the final result of the conversation was that Campbell was to buy for him, if he saw an opportunity, some stock of the Lampson Cash-Carrier Company, which would cost from $1,400 to $1,500 for a hundred shares; that he told Campbell he would like to have him buy him a hundred shares of it; that no other stock was talked of; and that he had repeatedly and distinctly told Campbell that he should not, under any circumstances, speculate, because, being a married man, and having a child, he did not think it would be proper for him to speculate, and he refused in every way to do it, and that Mr. Campbell understood that distinctly. The plaintiff states positively that at that time there was nothing said about buying any bonds, and that there was no authority given to buy any stock except that of the Lampson Cash-Carrier Company. Mr. Campbell says that the business of the plaintiff with Clark, Ward & Co. was generally talked over, and that, after discussing as to purchases and business for the plaintiff's account, the plaintiff offered to transfer that account, using the equity in it as security for any further purchases that he might make; that the plaintiff "came in to discuss generally the market, the situation in stocks, and stated that now he was out of business, having been in the dry-goods business, and that he had a family to support, and that, if possible, he would like to make a dollar, and if I would help him he would like to have me do it." He says that then followed a general discussion of the general condition of various stocks, and that during this general conversation plaintiff stated to Campbell that what he meant was that, if Campbell saw a chance to make a dollar for him, he would want to do it, and that Campbell replied, "Yes." Campbell further says that the plaintiff stated during that conversation a desire to make money by purchasing stocks for a rise. No other testimony was given by Campbell as to this conversation, and there is no claim that there was any further communication with the plaintiff about business until after the purchase of the Reading bonds, which was made on the 17th of February, 1893. As was said, the notice of this purchase reached the plaintiff on Saturday, the day after it was made, and after business hours, so that he was unable to communicate with defendants until Monday, February 20th. The plaintiff says that on that day he had a telephone communication with Campbell, in which he said that Campbell had no authority to buy anything but the Lampson carrier

stock; that they had never talked about Reading, or any other stock than that, and that he declined to have anything to do with it; that he wanted nothing to do with Reading; that he wanted no speculation; that defendants had no authority for that, and that he would have nothing whatever to do with Reading or any other speculative stock. Campbell, admitting that there was a conversation over the telephone on Monday, says positively that no such conversation took place as stated by plaintiff, but that he discussed the situation or condition of the Reading Company, and the prospect and current rumors in Philadelphia, his disturbance over the situation, and his fear that the security might go still lower, and, finally, that he should want to rely upon the defendants to look after the thing for him. Campbell says positively that the plaintiff did not repudiate the transaction in any way. This was the sum of the oral testimony with regard to the matter. Upon this testimony it is quite clear that there was not only a conflict, but a sharp conflict, of evidence for the jury to decide. But the defendants, admitting that, claim that the correspondence which is in evidence, and which it is conceded took place between the parties with regard to the same transaction, is such as conclusively to contradict the plaintiff's story that he repudiated the transaction, and conclusively to corroborate Campbell's story that plaintiff ratified the purchase.

While considering the weight to be given to this testimony, it is necessary to bear in mind the precise question to be presented to the jury, and the position which each party took with regard to it. The fact that the plaintiff was liable for the purchase of these bonds was set up by the defendants as an affirmative defense. Upon them, therefore, lay the burden, not only of proving the purchase of the bonds, but of proving either that that purchase was authorized, or, if not authorized, that it was subsequently ratified, so that the plaintiff was bound by it. All the testimony with regard to the original authorization has been stated in the former part of this opinion, and it is quite clear that the jury might have found from that that Campbell was not authorized to make any such purchase, or any purchase. Indeed, it seems to us that upon that branch of the case there can be no question that the defendants entirely failed to show an original authorization. It appears in the case that the plaintiff had never had but one speculative transaction. Nobody pretends anything to the contrary. All the authorization that the defendants claim is that which was sworn to by Campbell, and it is very evident that what was said to Campbell does not amount to an authority to buy stock upon speculation, unless a much broader construction is given to it than the words themselves would seem to indicate. The most that Campbell says is that the plaintiff told him he would like to make a dollar if he could, and that, if Campbell would help him, he would like to have him do it. This, standing by itself, is a long way from giving authority to a man to make any speculative transaction, and, taken in consideration with the fact that neither the defendants' firm nor Campbell had ever done any such business generally for the

plaintiff, it practically required the jury to find that there was no original authority. In order that the defendants might succeed, therefore, they were obliged to show that this transaction was ratified by the plaintiff. The burden of proof lay upon them from the beginning to the end of the case to do this thing, and in analyzing this evidence it is necessary to bear this in mind. Upon that point the defendants held the affirmative throughout the trial, and their relation to the question never changed. Of course, it happens frequently during the progress of a trial that the party on whom the burden of proof rests gives evidence tending to establish his allegation, sufficient sometimes to establish it prima facie; and it is sometimes said under those circumstances, loosely speaking, that the burden of proof is shifted; but, as is said by Church, C. J., in Heinemann v. Heard, 62 N. Y. 455:

"All that is meant by this is that there is a necessity of evidence to answer the prima facie case, or it will prevail; but the burden of maintaining the affirmative of the issue involved in the action is upon the party alleging the fact which constitutes the issue, and this burden remains throughout the trial." .

What was the fact to be established by the defendants? It was that the plaintiff, having given no original authority to purchase this stock, ratified the act of the defendants after he had been advised of it. In this case no rights of third parties are involved. Under such circumstances, a ratification rests upon the actual and existing purpose to approve the act that has been done. It is a thing which rests within the intention, where the question is between the original parties, and depends upon the fact, and not upon appearances. Glenn v. Garth, 133 N. Y. 18, 30 N. E. 649, and 31 N. E. 344. Before one is called upon to ratify any unauthorized transaction which has been made for him, he is entitled to have all the facts put before him; and after he has received that knowledge he is entitled to a reasonable time in which to act before he can be compelled to take his position with regard to the transaction. 1 Am. & Eng. Enc. Law (2d Ed.) p. 1205. So the question here was whether the defendants had satisfied the jury by a fair preponderance of evidence, when this case closed, that the plaintiff, with knowledge of all the circumstances, having a reasonable time to consider the matter, had ratified this transaction, which in his name had been entered into without authority. The defendants claim that the story of the plaintiff is so contradicted by the letters which are presented in the case that his evidence is entirely overthrown, and a verdict based upon it cannot stand. The first letter was written on the 20th of February, 1893, which was Monday. It was two days after the plaintiff had received notice of the transaction. It was the first communication, except the telephonic communication, which he had made. It refers to the telephonic communication. It does not, however, state that by the talk through the telephone the Reading purchase had been repudiated, but gives another version of it. Neither is it said in the letter that the transaction is repudiated. On the other hand, there is nothing in the letter from which it can be inferred that the trans-

action is adopted. Reasons are given why no such purchase should have been made, and there is considerable discussion of the condition of the Reading Company, and it is evident from the letter that the plaintiff was very much worried over the transaction, and not at all certain as to the situation which he' occupied about it. This letter is·followed by one written by Campbell on the 21st of February, acknowledging the receipt of plaintiff's letter of the 20th; and it is said that the fact that that letter makes no reference to a repudiation of the purchase by the telephonic communication affords almost conclusive evidence that no such repudiation had been made, for, if it had, Campbell would surely have referred to it. It must be remembered that these letters are not dispositive documents which are to stand as the basis of rights acquired under them. They are simply put in evidence for the purpose of elucidating, so far as may be, the state of mind of the parties at the time they were written, and showing the precise nature of the transactions which took place between them. They are not documents of which the construction is for the court, but they are portions of the evidence given to enable the jury to come to a conclusion whether or not a particular thing was said; and the fact that they make no statement of the saying of it, while it may be strong evidence tending to show that nothing of the kind was said, nevertheless, is nothing but evidence, and is to be considered by the tribunal whose duty it is to pass upon the evidence precisely as any other testimony which is offered and referred to. In such cases it is the right of the party to explain any apparent contradiction. The weight to be given to his explanation is necessarily matter for the jury. If the explanation is satisfactory to them, the apparent contradiction is removed; if not satisfactory, the contradiction still remains, and the conflict of evidence is still there; and it is left for the jury to say where, under all the circumstances, in view of the conflict and contradiction, they think the fact lies. In this particular case, if no testimony whatever had been given, the defendants surely would have been defeated. Even had the case stood upon the testimony of Campbell alone, it is well settled that his evidence must have been submitted to the jury, and that it would have been error to order a verdict, because he was an interested party. Kavanagh v. Wilson, 70 N. Y. 177; Wilcox v. Selleck, 92 Hun, 37, 36 N. Y. Supp. 633. We have, then, this peculiar state of facts: The defendants had the burden of proof. They sought to establish the necessary fact by the testimony of a witness which, if it had been uncontradicted, must necessarily have been submitted to the jury to say whether they would accept it as the basis for a verdict in favor of the defendants. It was contradicted. There was opposed to it the testimony of the plaintiff, equally positive, equally clear, and whereby a serious conflict of testimony was raised. The objection is that the evidence of the plaintiff is not worthy of belief, because it was conclusively contradicted by the letters which were in the case. One answer is that, if that were so, still the weight to be given to the testimony of the defendants, upon whom rested the burden of proof, was entirely for the jury.

Another answer is that whether or not these letters, written under the circumstances here appearing, conclusively contradict the testimony of the plaintiff, must be decided like any other question of fact. In such a case as this, where testimony is given by interested witnesses, and there is a clear conflict, a finding of the jury against the party who has the burden of proof should never be set aside unless it is opposed by such overwhelming testimony that it must be said that the jury were influenced by prejudice, passion, or corruption to reach the conclusion which they did. In our judgment, that condition of affairs does not exist here. Because of the persons by whom the testimony was given, and because of the nature of the testimony that was given, the case was peculiarly one for the consideration of the jury, and when they have decided it their conclusion ought not to be interfered with.

The judgment and order should be affirmed, with costs.

PATTERSON and INGRAHAM, JJ., concur.

WILLIAMS, J. (dissenting). The questions of fact tried and submitted to the jury were: (1) Whether the defendants were originally authorized to purchase the $10,000 of bonds for the account of plaintiff; and, if not, (2) whether, the purchase having been made under the claim of authority, the plaintiff ratified the purchase. The only witnesses sworn were the plaintiff and the defendant Campbell, but there were some letters written by these witnesses which were put in evidence. The appellants claim that the jury, in rendering the verdict, must have proceeded upon the theory that there was no authority for the purchase originally, and that the purchase was not ratified, but was repudiated, by the plaintiff. The appellants are very likely correct as to the theory upon which the verdict was arrived at. It is not claimed there was original authority to purchase these specific bonds. There was no talk about these bonds before they were purchased. On the 14th day of February, 1893, the parties had an interview in Boston. They do not agree as to the particulars of this interview. The plaintiff, in brief, testifies that there was talk about having defendants purchase for plaintiff 100 shares of certain stock, but no other stock or bonds were talked about, and he (plaintiff) stated that he would not speculate in any possible way; while the defendant testifies that there was a general discussion of the stock market, and plaintiff said he would like to make a dollar if defendant could help him do it; and that he wanted defendant to buy something for him that he could make a profit upon, if he could. The defendants claim that as a result of this interview they had general authority to purchase anything they thought would pay the plaintiff a profit. These witnesses are both parties to the action. Their credibility was for the jury, and the jury had a right to believe the plaintiff and to disbelieve the defendant; and their finding as to the real nature of this interview will not be disturbed by this court on appeal, unless the subsequent transactions between the parties, as developed from their other evidence and their correspondence,

were such as to require the jury to credit the defendants' evidence rather than the plaintiff's with reference to this particular interview. The plaintiff, after this interview, left Boston, and went to Philadelphia. On the 17th day of February, 1893,—Friday of the week,—the defendants purchased the $10,000 of bonds for the account of the plaintiff. On the same day this defendant wrote plaintiff the purchase had been made for him, that he (the defendant) regarded the purchase as a good one, that he would look after the bonds, and would sell when they went up. This letter was received by plaintiff the next day, Saturday, after business hours, and too late to telephone that day. On Monday morning the plaintiff talked with this defendant over a long-distance telephone between Boston and Philadelphia. Both parties testify as to this interview, and they do not agree as to its details. The plaintiff testifies that he said to this defendant that he (defendant) had no authority to make the purchase; that he (plaintiff) wanted nothing to do with these bonds, wanted no speculation, and asked defendant what he was going to do; that this defendant said he was going to buy more for him (plaintiff), and hold them; and that he (plaintiff) replied that he would have nothing to do with these bonds or any other speculation. While this defendant testifies that the plaintiff in this interview discussed the situation or condition of the company whose bonds had been puchased, the prospects and current rumors in Philadelphia, and his disturbance over the situation, his fear that the bonds might go still lower, and said finally that he should want to rely upon him (the defendant) to look after the bonds for him, and that he did not in any way repudiate the purchase. Here, again, the credibility of these witnesses was for the jury, and either might be believed or disbelieved, unless other evidence in the case required the jury to believe one and disbelieve the other. On the same day—Monday, February 20, 1893— the plaintiff wrote this defendant a letter, which was put in evidence upon the trial, wherein the plaintiff discussed the rumors in Philadelphia as to the Reading Railroad Company, whose bonds had been purchased, and said:

"You can imagine my surprise when I found you had bought [the bonds], when, as I say it was known * * * there seemed no probable way that [the company] could escape bankruptcy. * * * Could you expect me to buy into a lawsuit? You know my position. * * * Please let me hear from you by return mail. I've got a fair amount of nerve, but I'll allow I have sensations to-night which I hope you may never experience."

There was reference made in this letter to the telephone interview, but no claim made that he (the plaintiff) had in that interview asserted want of authority in this defendant to purchase the bonds, or that he had repudiated the purchase for himself. The next day—Tuesday, February 21, 1893—this defendant replied to this letter, and, having discussed the situation of the Reading Railroad Company, said:

"Prices are steadier to-day, and the general feeling is that the worst is over, and that from now on we shall see an improvement. It might be policy on the snap rise to let the bonds go with a view to buying back at a profit, but

I would not advise this, except on a good sharp advance. 'I will watch things for you, and keep you posted, and don't think in the end you will be a loser. \* \* \*"

Two days later, and on Thursday, February 23, 1893, plaintiff telegraphed defendant's firm:

"I positively decline to accept purchase of \* \* \* bonds. Have written you."

And on the same day the plaintiff wrote the defendant's firm:

"In view of our conversation when I was in Boston last week, I have wired you this · morning that I positively decline to accept purchase of \* \* \* bonds. I distinctly told you that I did not wish under any circumstances to engage in a speculation. \* \* \* The whole tenor of our conversation was against anything involving risk in a speculative way. The only definite transaction that entered into our conversation was that \* \* \* [as to a particular stock] I would be willing to take a small quantity. \* \* \*"

To this letter the defendant made a reply the next day, expressing surprise, reiterating his position, etc. It is unnecessary to follow the correspondence further. If there was a general authority resulting from the interview in Boston, February 14, 1893, to purchase securities, no particular ones being agreed upon, it is doubtful. in the absence of fraud, if he could repudiate the purchase at all. If there was no such general authority in fact, but the defendants assumed to have such authority, then, upon being notified of this purchase of the bonds on Saturday, the 18th of February, 1893, it was the duty of plaintiff, if he desired to repudiate the purchase, to do so at once, promptly; and it was too late for him to do so for the first time on the following Thursday, February 23, 1893. Unless he did so on Monday, February 20, 1893, in the telephone interview, he was bound by the purchase. It seems to us, however, considering the transactions between the parties subsequent thereto, as disclosed by the correspondence to which we have referred, the conclusion is irresistible that there was such general authority growing out of the interview in Boston, and, moreover, that there was no repudiation of the purchase in the telephone interview on Monday, February 20, 1893. The plaintiff might have used the telegraph on Saturday, February 18, 1893, to squarely deny any authority, and repudiate the purchase, and it is inconceivable that the plaintiff would have written the letter of Monday, February 20, 1893, if there had been no such general authority, or if, in the telephone interview of the same morning, the plaintiff had actually denied such authority, and repudiated the purchase, as he claims he had done. The letter contains no intimation of denial of authority or repudiation, no suggestion that the telephone interview was to that effect. The letter expressed simple surprise that the bonds had. been purchased in view of the rumors in Philadelphia, and his ideas of the condition of the Reading Railroad Company, whose bonds had been purchased, and the letter closes with the statement that he (plaintiff) could not be expected to buy into a lawsuit; that he (plaintiff) had a fair amount of nerve, but he had sensations which he hoped defendant would never experience, and asks for a reply. This letter was written Monday night, while

the telephone interview had taken place early in the same day. Moreover, the defendant's letter the next day, Tuesday, in reply, makes no reference to any denial of authority to purchase, or repudiation of the purchase, as having been made in the telephone interview, contains reassurances to plaintiff that he would not be a loser in the end, and promises to watch things for plaintiff, and keep him posted. And to this letter plaintiff made, no reply. Two days later, the plaintiff, for the first time, by telegram and letter, expressly declines to accept the purchase. This was too late, as we have said. Letters are troublesome evidence. They cannot be gotten rid of by parol evidence. They must be relied upon as telling the truth; while parol evidence may be easily manufactured. These letters were concededly written. They are entirely consistent with defendants' parol evidence. They are entirely inconsistent with plaintiff's parol evidence. They lead irresistibly to the conclusion that there was general authority originally to purchase securities, and that there was not a sufficiently prompt denial of such authority, or repudiation of the purchase. We do not think the jury were at liberty to disregard the effect of this correspondence and of the transactions subsequent to February 14, 1893, and to believe the parol evidence of the plaintiff and disbelieve that of the defendant. Boyd v. Colt, 20 How. Prac. 384. These suggestions lead to the conclusion that the verdict of the jury was contrary to the evidence in the case, and should have been set aside, and a new trial ordered.

The order appealed from should be reversed, and an order entered setting aside the verdict, and directing a new trial, upon payment of costs of the trial, and appellants should have costs of this appeal to abide event.

VAN BRUNT, P. J., concurs.