MANNING v. HEIDELBACH et al.

(Supreme Court, Appellate Division, First Department. December 13, 1912.)

1. PLEDGES (§ 56*)—ACTIONS FOR CONVERSION—EVIDENCE.
    In a pledgor's action for conversion by the pledgee, evidence *held* to support a jury finding that the pledgees promised, notwithstanding the pledge agreement, to give notice to the pledgor before selling the pledged property.
    [Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

2. PLEDGES (§ 56*)—ENFORCEMENT—SALE—"BROKERS' BOARD."
    Where a pledge agreement provided that the pledgee upon default might sell the pledged property, and if the sale was made at brokers' board, or public auction, the pledgees might themselves become the purchaser, the pledgees had no right to purchase the property themselves at a sale on the curb, made at a place in the street where street or curbstone brokers were accustomed to congregate and trade with each other on their own account or for others; this not constituting a "brokers' board."
    [Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. PLEDGES (§ 56*)—ENFORCEMENT—SALE—VALIDITY.

Where pledgees, contrary to the terms of the pledge agreement, purchased the pledged property themselves, the pledgor was entitled to treat the sale as a nullity, regardless of the price realized.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

4. PLEDGES (§ 48*)—"CONVERSION" BY FAILURE TO RETURN.

Where a pledgee's sale of the pledged property, contrary to the terms of the pledge agreement is not ratified by the pledgor, a failure to return the property upon demand and tender of the indebtedness constitutes a "conversion."

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 113–117; Dec. Dig. § 48.*

For other definitions, see Words and Phrases, vol. 2, pp. 1562–1570; vol. 8, p. 7618.]

5. PLEDGES (§ 56*)—UNAUTHORIZED SALE—"RATIFICATION."

Where the rights of third parties are not involved, "ratification" of an unauthorized act is predicated upon an actual and existing purpose to approve the act, and depends upon the fact, and not upon appearances.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*

For other definitions, see Words and Phrases, vol. 7, pp. 5928–5932; vol. 8, p. 7778.]

6. PLEDGES (§ 56*)—UNAUTHORIZED SALE—RATIFICATION.

Before one is called upon to ratify an unauthorized transaction, he is entitled to have all the facts put before him, and then to a reasonable time in which to act before he can be compelled to take his position with reference to the transaction.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

7. PLEDGES (§ 56*)—UNAUTHORIZED SALE—RATIFICATION.

A pledgor of stock, upon learning of a sale by the pledgees, stated that the pledgees had no right to sell the stock in view of a promise made by them, but did not expressly repudiate the transaction. He thereafter acted with regard to the balance of the loan as though the amount received on the sale had been properly credited thereon. Upon being notified that other collateral would be sold unless the loan was paid, he procured a third party to take up a loan, and for that purpose obtained from the pledgees a statement of the amount due, and although this showed a credit of the amount received on the sale, and although he then had an opportunity to examine the collateral still held by the pledgees, he did not question the correctness of the statement. About two years after the unauthorized sale, he tendered the amount received on the sale, and demanded the return of the stock. *Held*, that he had ratified the unauthorized sale, not having asserted his claim before the pledgees, at his request, had transferred the other collateral, which they were entitled to hold until the loan was fully paid.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

Appeal from Trial Term, New York County.

Action by Henry G. Manning against Alfred S. Heidelbach and others. From a judgment for plaintiff, and from orders denying a new trial and granting an extra allowance, defendants appeal. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

· Louis Marshall, of New York City, for appellants.

George Zabriskie, of New York City, for respondent.

McLAUGHLIN, J.  Action to recover damages for the alleged conversion of 100 shares of stock of the American Tobacco Company. The defendants, on April 10, 1907, made two loans, aggregating $250,-000, to Milliken Bros., Incorporated, upon its two notes, which were indorsed by the plaintiff, the vice president.  As collateral security for the payment of the loans, the plaintiff delivered to the defendants certain stocks, including 100 shares of the American Tobacco Company, and bonds of the Milliken corporation, amounting, par value, to · $475,000.  The stocks and bonds thus delivered belonged to the plaintiff personally.  Shortly thereafter, at the request of the defendants, he signed a collateral loan agreement, giving to the latter the right, in case the notes were not paid when due, to sell the collateral, without notice to him, either at public or private sale, and, if the sale were made at brokers' board or public auction, the right to the defendants to become the purchasers.  The notes became due on the 10th of October, 1907, were duly protested for nonpayment, and on the 30th of October following the defendants sold the 100 shares of American Tobacco stock upon the curb, and the same was purchased by the firm, or one of its members, for $18,000, for which credit was given.

The plaintiff contends that the sale was not authorized, was voidable at his election, and for that reason the defendants thereafter continued to hold this stock upon the same terms as before.  On January 6, 1910, more than two years and two months after the sale, plaintiff tendered to the defendants $18,000, the balance of the debt having in the meantime been paid, and demanded the return of the stock.  The defendants refused to return it, and the plaintiff thereupon brought this action to recover the value of the same, as of the date the demand was made, viz., $42,500, together with the accrued dividends and interest, less the $18,000 which had been credited upon the debt, with interest.  He had a verdict for the amount claimed, and from the judgment entered thereon, and orders denying motions for a new trial and granting an extra allowance of costs, defendants appeal.

At the conclusion of the trial two questions of fact were submitted to the jury:  (1) Was the sale unauthorized?  And, if so, (2) did the plaintiff ratify it?  As evidenced by the finding, the jury resolved both in favor of the plaintiff.

As to the first question: The plaintiff testified that on the 19th of. September, 1909, the defendant Heidelbach orally promised that, notwithstanding the collateral agreement giving the defendants the right to sell without notice, they would, prior to the sale of the stock in question, give the plaintiff due notice of the time and place of the sale, and also afford him an opportunity to find a purchaser; that on the day the notes fell due Heidelbach repeated the promise in the presence of the defendant Ickelheimer; that on the 22d of October, another partner, the defendant Lichtenstein, told him, if the promise had been made, it would be kept.  Both Ickelheimer and Lichtenstein contradicted the plaintiff.  Heidelbach was not called as a witness, and

plaintiff's testimony as to the promise which he made on the 19th of September stands uncontradicted. On the day the notes fell due the plaintiff and his counsel, Mr. Cromwell, had an interview with the defendants, as a result of which an extension of 10 days within which to pay the notes was given. Two days after the extension expired defendants notified the plaintiff by letter that, not having heard from him in the matter of paying the loan, they would deal with the securities in such manner as they saw fit; and on the 30th of October, without having given the plaintiff any notice of the time and place of sale, they sold, on the New York Stock Exchange, 300 shares of American Snuff, receiving therefor $45,000, and, on the curb, the 100 shares of Tobacco, for $18,000; the firm, or some member of it, being the purchaser of the latter. The aggregate amount of the two sales, $63,000, less brokers' commissions and transfer tax, they credited upon the indebtedness, which left due on March 30, 1908, other payments having been made, $119,368.15. After the sales the defendant Ickelheimer telephoned the plaintiff that they had been made, the amount received, and that he, or the defendant firm, had purchased the Tobacco stock. The plaintiff testified that in response to such information he told Ickelheimer that the firm had no right to sell the stock, in view of the oral promise theretofore made to him, and that Ickelheimer made no reply thereto. On the same day written notice was given to the plaintiff, received by him the day following, of the sale, the price received, and the amount applied on the indebtedness. The plaintiff paid no attention to the written notice, nor did he then or at any time thereafter make any objection thereto, until he demanded the return of the Tobacco stock, shortly prior to the commencement of this action.

[1, 2] I am of the opinion that the evidence was sufficient to sustain a finding that the oral promise not to sell without notice was made. But, irrespective of this question, I think the plaintiff, so far as the sale of the Tobacco stock was concerned, could treat it as though no sale had been made. The sale of this stock, as already said, was upon the curb. Defendants purchased it themselves; in other words, they, in effect, took it at a price named by themselves. The collateral agreement gave them the right to become purchasers only in case the sale were made "at brokers' board or at public auction." This sale was not at either. It was made in the street, at a place where street or curbstone brokers were accustomed to congregate and trade with each other on their own account or for others. Brokers dealing in this way do not constitute a brokers' board. Bouvier's Law Dictionary, vol. 1, page 268.

[3, 4] It may be that the defendants took the stock at a price as high as could have then been realized, had the sale been made either at brokers' board or public auction; but they had agreed with the plaintiff, if they became the purchasers, the sale should be made in a certain way. This agreement they violated, and this gave the plaintiff the right to treat the sale as a nullity, and to get back his stock on paying the indebtedness. A failure to then redeliver the stock amounted to a conversion, and entitled him to recover the value of

it at the time the demand was made, provided he had not theretofore ratified the defendants' act in purchasing the stock at a sale on the curb.

[5, 6] This brings us to a consideration of the second question, viz., whether there had been, prior to the demand, a ratification. After carefully considering all the evidence bearing upon this subject, I am clearly of the opinion that he did ratify the sale, and the finding of the jury to the contrary, if not unsupported by evidence, is clearly against it. Where the rights of third parties are not involved, a ratification of an unauthorized act is predicated upon an actual and existing purpose to approve the act that has been done. Hopkins v. Clark, 7 App. Div. 207, 40 N. Y. Supp. 130; affirmed 158 N. Y. 299, 53 N. E. 27. It is a thing which rests with the intention, and depends upon the fact, and not upon appearances. Glenn v. Garth, 133 N. Y. 18, 30 N. E. 649, 31 N. E. 344; Burhorn v. Lockwood, 71 App. Div. 301, 75 N. Y. Supp. 828. Before one is called upon to ratify an unauthorized transaction, he is entitled to have all the facts put before him, and then to a reasonable time in which to act, before he can be compelled to take his position with reference to the transaction. 1 Am. & Eng. Enc. of Law (2d Ed.) 1205.

[7] In the present case the plaintiff, immediately following the sale of the stock in question, was informed of all the facts relating thereto. He knew who had purchased the stock, the amount paid, and credited upon the loan. He did not then expressly repudiate the transaction. All that he did, according to his own testimony, was to tell Mr. Ickelheimer, the one who gave the information, "he had no right to sell * * * those stocks with the promise that had been made to him by the firm." This is the only intimation that was ever given to the firm which could by any possibility be construed into a disaffirmance, and what thereafter occurred, if not as matter of law, certainly as matter of fact, shows that he did approve of the act and took advantage of it. The day following the sale he received the written statement, to which reference has already been made, which he retained without objection, and thereafter, until about the time this action was commenced, acted regarding the balance of the loan as though the amount received from the sale had been properly credited thereon. After crediting the amount received from the sale of the stocks on the 30th of October, there remained due to the defendants upwards of $119,000, as collateral security for the payment of which they still held the bonds of Milliken Bros., Incorporated. On the 17th of March, 1908, defendants notified the plaintiff that these bonds, unless the balance of the loan were paid, would be sold at public auction on April 8th, and on the 23d of March following the notice was repeated, specifying the place and time of sale.

Mr. Cromwell was then acting as counsel for the plaintiff, and also as counsel for the receiver of Milliken Bros., Incorporated. After receiving these notices the plaintiff endeavored to raise money for the purpose of paying off the loan and redeeming the bonds, and to that end he placed in Mr. Cromwell's hands $33,000; but, being unable to raise the balance, he entered into an arrangement with Mr. Cromwell

by which he was to make up the balance and take over the loan. It is true Mr. Cromwell testified he was, at the time, acting as counsel for the receiver, and taking over the loan was to prevent the bonds being thrown upon the market, which would interfere with a reorganization of the corporation; but it is apparent that he was also acting in the interest of the plaintiff. On the 30th of March, the plaintiff wrote the defendants a note, requesting them to send by bearer a statement of his account. He testified he did this at the suggestion of Mr. Cromwell, and handed the letter to him, and it was sent to the defendants by one of his clerks. The statement was sent on the same day, and it showed a balance due the defendants of $119,368.15, after crediting the proceeds of the sale of the Snuff and Tobacco stocks. On the day following this amount was paid, and the notes and collateral transferred, with the written consent of the plaintiff, to Mr. Cutter, the representative of Mr. Cromwell. The plaintiff was in Mr. Cromwell's office at the time the payment was made, and remained there until after the messenger returned from defendants with the notes and collateral they held. The collateral was immediately passed over to the plaintiff, to determine whether it had all been returned. In making this payment Mr. Cromwell used the $33,000, raised by the plaintiff, who also placed in Mr. Cromwell's hands additional collateral to secure him for advancing the balance.

It is perfectly apparent that in taking over the loan Mr. Cromwell was acting for the plaintiff and was his representative in the transaction. Otherwise, why was the statement as to the amount due asked for and given to Mr. Cromwell? Why was the $33,000 used and the additional collateral given? What was the plaintiff doing in Mr. Cromwell's office while the final transaction was being carried out, and the collateral, as soon as returned, passed over to him to verify? The court cannot shut its eyes to an obvious truth, even though a jury finds to the contrary. The plaintiff knew how much the defendants claimed was due. He asked for the statement. They sent it to him, or his representatives, which showed that the proceeds derived from the sale of the stocks in question had been credited and the loan correspondingly reduced. He in no way questioned the correctness of the statement; on the contrary, permitted the defendants to act upon the assumption that he accepted it as correct. If he were to treat the sale as unauthorized, he could not accept the credit of $63,000, and in that case the balance due was $182,000, instead of $119,000. The situation, as I view it, was precisely the same as if the plaintiff himself had paid the amount which the statement showed was due and thereby obtained the collateral. The defendants had a right to hold the collateral until the loan was fully paid, and it had not been fully paid if plaintiff were to treat the defendants as though they still held the Tobacco stock. The legal position of the parties was not changed in any respect because, instead of paying the defendants personally, he caused, or permitted, them to be paid by Mr. Cromwell. The plaintiff furnished a part of the money, and put up collateral to induce Mr. Cromwell to furnish the balance. Honesty and fair dealing required the plaintiff, before defendants at his request transferred all of the

collateral and the notes, to assert his claim. He could not remain silent for nearly two years, and then, when the stock had advanced from 180 to 420, hold the defendants for the difference. He had to assert his claim, if at all, before the defendants at his request had changed their position.

My conclusion, therefore, is that, notwithstanding the fact that the sale was unauthorized, the plaintiff ratified the same, and the finding of the jury to the contrary is against the evidence.

Other questions are raised by the appellants, but the conclusion thus reached renders it unnecessary to pass upon them.

The judgment and orders appealed from are reversed, and a new trial ordered, with costs to appellants to abide event. All concur.