## BERNARD D. HATHCOCK *v.* GEORGE MACKUBIN ET AL.

[No. 54, October Term, 1933.]

*Decided January 17th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*Allan W. Rhynhart* and *Francis C. Brooke,* with whom were *Cromelin & Laws* on the brief, for the appellant.

*Carlyle Barton* and *Theodore R. Dankmeyer,* with whom were *George S. Yost* and *Niles, Barton, Morrow & Yost* on the brief, for the appellees.

ADKINS, J., delivered the opinion of the Court.

This is a suit by a customer against brokers for loss resulting from an alleged failure by the brokers to execute the order of the customer to sell certain stocks which the brokers were carrying for the customer on a margin account as follows: 25 shares Bethlehem Steel; 25 Radio; 25 General Foods; 25 Reynolds Tobacco B.; 25 United States Pipe & Foundry; 125 Packard New.

The appellees, brokers, on the afternoon of Monday, October 21st, 1929, called on Hathcock, the appellant, for $1,400 additional margin. On the following morning, October 22nd, 1929, about 9.45 a. m., the appellant got in touch with John Mothershead, a representative of appellees at appellees' office in Washington, and, after some discussion in regard to the call for additional margin, appellant told Mothershead that he had decided to get out of the market, and that, while he disliked to sell at present prices, to protect himself he wanted stop loss orders put in at one point below the closing prices for the previous day, and Mothershead refused to accept stop loss orders, saying the he could not be bothered with them. Appellant then said, "If you can't handle the stop loss orders, place orders to sell out all of my stocks at the opening of the market." This meant, according to appellant, that the orders were to be executed as soon as the market opened at 10 a. m. or as soon thereafter as possible on October 22nd, 1929, on the New York Stock Exchange. On the advice of Mothershead that the market would weaken at the opening on account of accumulated orders to sell, appellant changed his order and directed sales to be made "shortly after the market opened," and at his request gave him a list of the securities. On

October 24th, 1929, appellant received from appellees a confirmation of the sale of 25 shares of Reynolds Tobacco B. at 57, with a net credit to appellant of $1,419.88. The confirmation was dated October 23rd, 1929. Appellant received this confirmation on October 24th, 1929, and at once went to appellees' Washington office to make inquiry. He arrived at the office at 11 a. m. and told Mothershead he had received the confirmation, and asked what he had done about the other stocks. "He told me that he had not sold them because he had been so busy taking care of accounts which were in worse condition than mine, he had not had time to devote to my account." He said nothing further about the Reynolds stock. Appellant became quite angry, and went down to the telegrapher and decided "that I had better sell out the remainder of my holdings. * * * I proceeded to write out orders for the sale of the other stocks which I held." In answer to a question by the court "You mean you gave the firm of Mackubin, Goodrich & Company on that date a new order to sell the rest of your stock?" he replied, "Yes, sir." Q. You gave that direct to the telegrapher. Ans. Yes, to sell two lots of this. I started to sell them all. I gave orders to sell one hundred and twenty-five shares of Packard and twenty-five shares of General Foods." He said the reason he gave the orders direct to the telegrapher was that Mothershead had neglected to execute the orders he had given two days previously, and on the 24th broke off their conversation by going to the telephone to answer a call, "so that I had nothing to do but go back to the telegrapher and give the telegrapher the orders." The orders were made out on blanks which were on the telegrapher's desk, and the orders "were written orders directing Mackubin, Goodrich to sell the stock immediately." After he had gone home on October 24th, appellant got a report from Mothershead as to the price received for the stocks sold that day, as reported to him. There seemed to be some error in the price reported for the General Foods, which Mothershead had adjusted; but he was unable to get an adjustment of what appellant thought was an error in the price for part of the

Packards, although complaint was made to the New York Stock Exchange, to which the exchange replied to appellant in a letter of January 6th, 1930. Appellant testified that his claim in the present case was predicated entirely on the failure of appellees to execute the orders of October 22nd, 1929; that he made no claim on account of the Reynolds stock; that the later dealings with regard to the Packard stock and the General Foods stock were for the purpose of minimizing the loss that would occur either to the appellees or to the appellant.

It is not perfectly clear from the record just when appellant notified Mothershead he intended to hold him responsible. He said on cross-examination that it was not in the conversation above referred to on the 24th, that he took "the position that any further dealings with those securities were Mackubin, Goodrich's risk," that appellant "had nothing further to do with this account." "Q. At that time you gave orders to the telegrapher, I believe you said? Ans. I decided at that time that the best thing for me to do was to minimize the loss by selling out everything that I could sell out. Q. So at that time you abandoned any claim for their failure to carry out your order of October 22nd? Ans. Most certainly not, no sir. Q. Didn't you say that you decided to minimize your loss and sell the stock for the best price you could get? Ans. I certainly said that and that is exactly what I mean. Q. You did give orders to sell two of those securities, Packard and General Foods? Ans. Yes. Q. Why didn't you give orders to sell the other three? Ans. The prices were sagging quite markedly at that time and I thought may be in half an hour or three quarters of an hour there would be a better tendency and I could get a better price, I decided to sell these two and wait a little while before I put in an order to sell the others. Q. You decided not to sell the others? Ans. Yes, sir. Q. You were waiting for an improvement and get better prices? Ans. Yes, sir. Q. In spite of your order of the 22nd you continued to deal with these securities and to give orders to sell or hold them as you thought was the wisest

course to pursue? Ans. I assumed it was the wise thing to do to save as much of the account as possible after I found Mr. Mothershead did not take sufficient interest to execute my orders."

So far as the record discloses, it was not until after the above occurrences, and after appellant received a call dated October 24th for additional margin, that he indicated to Mothershead that he intended to hold him responsible. After the receipt of that call by appellant, Mothershead communicated with him, telling him that his account was approximately wiped out, and that, unless he received more margin, he would sell out some more of the stocks. In response to which appellant said: "I told him that the responsibility was in his hands; that I had previously given orders for him to sell the stocks and that his failure to do so had resulted in a loss to me; that the panicky condition of the market on the 24th led to a situation I couldn't help myself, and so I considered he was fully responsible and I would hold him for the result of his negligence."

The three items which appellant had not ordered sold on October 24th were later sold by appellees (the last on October 29, 1929), because he refused to put up any more money for margin. After the stocks were all sold and Mothershead demanded payment of $224.71 for a balance which he claimed appellant owed on the account, appellant told him that, if he would adjust that Packard transaction, it would take care of the balance. At that time, apparently, there was no suggestion by appellant of any counterclaim by reason of the failure of appellees to execute the order of October 22nd. Indeed appellant testified that no claim for a definite sum was made until this suit was instituted. His attorney testified, however, that the details of appellant's claim were made known to appellees' attorney in the latter part of November, 1930.

The above statement of facts is taken from the testimony of the appellant. At the conclusion of his testimony the court granted a prayer for a directed verdict in favor of the defendant, on the ground that there was no evidence legally

sufficient to entitle the plaintiff to recover. This was the subject of plaintiff's fourth bill of exception. There were three relating to rulings on evidence. The first was to the refusal to admit over objection a paper purporting to be plaintiff's computation of the amount claimed by him to be due. The third was to the refusal to admit the docket entries. Both of these were unimportant in the view we take of this case, and need not be considered. The second was to the refusal to admit a letter from appellee's Washington attorneys to appellant's attorney. The ruling was correct. The letter clearly was written with a view to a possible waiver by each party of any claim against the other and was in the nature of a suggestion of compromise.

In considering the prayer for a directed verdict, the only question seriously argued by appellee, and the only one that could be, was that of ratification. On plaintiff's testimony, defendants were clearly liable for their failure to execute plaintiff's order to sell on October 22nd, 1929, which they accepted, unless their conduct was subsequently ratified by the plaintiff.

There was no express ratification, and the contentions of the appellant are: (1) That whether or not the subsequent conduct of the appellant amounted to a ratification was a question which should have been submitted to the jury; (2) that it was the duty of appellant to minimize the loss, and what he did in reference to the sale of the stock after the failure of appellees to execute his order of October 22nd was done for that purpose, and cannot be said as a matter of law to have operated as a ratification. And in support of these contentions he cites the following cases: *Sparling v. Wade,* 210 App. Div. 774, 206 N. Y. S. 379. In that case there was a conflict of testimony, and therefore a jury question. So, also, in *Hershey v. Hanauer,* 108 Wash. 498, 185 P. 627, which was an unauthorized sale. Appellant's quotation from *Allen v. McConihe,* 124 N. Y. 342, 26 N. E. 812, 813, expressly distinguishes between a case when the legal title to shares of stock is in plaintiff and he has control of it (in which case he should sell within a reasonable time, or permit

his agent to sell, so as to render the loss as slight as possible) and cases like the present, where "there was no way in which he could sell it, except through his brokers, without paying its purchase price, taking the certificates, and then selling them, which he was under no obligation to do for the protection of his defaulting agents."

In *Ramsay v. Miller*, 202 N. Y. 72, 95 N. E. 35, the trial court directed a verdict for the plaintiff, thus excluding the defense of ratification. On appeal the court said there was enough evidence of ratification to be submitted to the jury. *Hurdy v. Taylor*, 181 N. Y. 231, 71 N. E. 977, decides nothing except that recovery cannot be had on wager contracts. *Burhorn v. Lockwood*, 71 App. Div. 301, 75 N. Y. S. 828, appeal dismissed in 177 N. Y. 539, 69 N. E. 1121, was a case of short sale of stock which the customer informed broker was unauthorized. Held, that it could not be said as a matter of law that failure to return an account of sale subsequently sent by broker operated as an acquiescence or ratification of the unauthorized sale.

In *Hopkins v. Clark*, 7 App. Div. 207, 40 N. Y. S. 130, there was a conflict of testimony on the question of ratification. It was a case of an alleged unauthorized purchase of bonds. One question was whether plaintiff with knowledge of all the circumstances and a reasonable time for consideration had ratified. In *Hirsch v. Deschler*, 231 App. Div. 237, 247 N. Y. S. 143, broker was instructed by customer to sell out when his margin was impaired. The market broke and customer demanded of the branch manager of the broker that the account be sold out. The branch manager replied he "would sell nothing, he had nothing to do with selling and if Deschler wanted to sell he should give his own orders to the selling clerk," which Deschler did not do. The broker sued for amount due on the account. The court in that case seems to have thought that the customer should have saved himself by doing what the manager told him to do. Except on that theory, the statement that it was the duty of Deschler to have sold his securities at the time when Hirsch, the broker, broke the agreement, is inconsistent with the ruling

in *Allen v. McConihe, supra,* and in *Smith v. Hutton,* 138 App. Div. 859, 123 N. Y. S. 656, affirmed in 203 N. Y. 594, 96 N. E. 1130. *Hirsch v. Deschler* was affirmed in 257 N. Y. 570, 178 N. E. 799, but on other grounds, the Court of Appeals holding that the contract on which the customer depended was so extraordinary as to be in excess of the authority of plaintiff's manager.

In *Burnham v. Lawson,* 118 App. Div. 389, 103 N. Y. S. 482, there was an unauthorized sale of stock. Held, that, as plaintiff was not apprised of all the facts, a delay of 12 days in repudiating the transaction did not amount to a ratification. *Baker v. Drake,* 53 N. Y. 211, was the case of the unauthorized sale of stock carried by a broker for a customer on margin. Held, a conversion, and that the customer's remedy was to replace the stock if the broker refused to do so, and sue for the advance in market price. *Brightson v. Claflin,* 225 N. Y. 469, 122 N. E. 458, was not a case between customer and broker, or principal and agent, but between debtor and creditor. The creditor sold collateral in an improper manner, and the question was whether the debtor by failing to object or by delay lost his right to sue. The fact that the court in such a case held that the absence of the element of estoppel was important does not necessarily mean that estoppel is a necessary element in ratification of the acts of an agent by the principal.

*Middendorf, Williams & Co. v. Milburn Co.,* 134 Md. 385, 107 A. 7, is cited by appellant as authority for the proposition that it was the duty of appellant to sell his stock in order to minimize the loss. But that was not a case of a customer buying and selling stock on the exchange through a broker on a margin account. There the brokers were employed as promoters to dispose of stock which the employer was trying to put out. The brokers, in consideration of the payment of a lump sum ($5,000), agreed, according to the court's interpretation of the contract, "to set in motion all of its available facilities and use all its financial connections, as well as its knowledge acquired by long experience, in a reasonable and *bona fide* effort to sell said stock. It

was held that, on the refusal of the brokers to perform, whereby the plaintiff was compelled to go elsewhere for assistance in raising the money required by it, it was its duty to make all reasonable efforts to minimize the loss sustained, if any, by reason of such breach, and to find another who would sell the stock or raise the money on terms equally advantageous as those contained in the alleged agreement with the defendant. All of which has no bearing on the purchase and sale of stock listed and regularly sold on a stock exchange and carried on a margin account, as were the stocks in the present case.

The contentions of the appellees are:

(1) That when appellant, with full knowledge of appellees' failure to carry out his order, gave appellees' telegrapher the new orders to sell a part of his stock and decided to await an improvement in market conditions before selling the balance, he thereby elected to ratify defendant's said failure. (2) That, inasmuch as the facts upon which the said ratification is based are proved by the appellant's own testimony and are clear and undisputed, the question of ratification *vel non* is a question of law for the court. (3) That appellant's subsequent dealings with the account cannot be construed merely as an effort to minimize his loss growing out of appellees' failure to carry out his instructions.

We think that all of these contentions are supported by the great weight of authority. In the *Law of Stockholders and Stock Exchanges,* by Charles H. Meyer, page 422, paragraph (g), it is said: "The issuance by the customer of instructions with respect to the transaction sought to be repudiated constitutes a ratification of the transaction. Such instructions, being inconsistent with the position that the transaction was not for the customer's account, necessarily imply acceptance and adoption." In support of this statement the author cites *Smith v. Hutton,* 138 App. Div. 859, 123 N. Y. S. 656, 660, affirmed on opinion below in 203 N. Y. 594, 96 N. E. 1130; *Buck v. Houghtaling,* 110 App. Div. 52, 96 N. Y. S. 1034; *Furman v. Lanahan,* 159 Md. 1, 149 A. 465. The last-mentioned case is indirectly in point.

It holds that the fact that one who directed his brokers to purchase securities to cover short sales previously made by the brokers in his name, but without his authority, gave such direction because the brokers threatened that, if he did not purchase the securities, they would do so out of his funds in their possession, did not show that, in giving the direction to buy, he acted under compulsion, so as to entitle him to recover back the money paid for such securities in excess of the price for which they had previously been sold in his name. This case is only in point on the contention of appellant that it was his duty to sell the stocks in order to minimize his loss. He was under no more necessity to sell, in order to protect himself, than the customer was to buy in *Furman v. Lanahan, supra.*

*Smith v. Hutton* is directly in point, and the facts are similar, though not as strong as in the present case. There the case was submitted to the jury only because there was a conflict of testimony as to which of two telegrams was first received by the broker. The plaintiff sent two telegrams, the first being an order to cancel his stops and sell at a certain figure, and the second sent a few minutes later reduced the price limit named in the first. Defendants contended that the second was delivered ahead of the first, and they supposed the price limit was raised, and that the market did not reach the higher limit, and therefore they were not able to sell. Not receiving a confirmation of sale, plaintiff wired inquiring what defendants had done. Defendants wired that they had done nothing because plaintiff had canceled his stops, and a few minutes later defendants sent another wire giving the limits mentioned in plaintiff's first telegram and inquiring whether they were correct. Plaintiff replied that they were wrong, and repeated the lower limits mentioned in the second telegram. Defendants replied that they had regarded plaintiff's telegrams in the order received, and that the fault was with the telegraph company, and asked whether they should change his limits. In reply plaintiff wired: "Close out the account at discretion but feel that I am justly entitled to sale of Union Pacific at 129½," which was

the price mentioned by plaintff in the second telegram. Plaintiff testified that he understood telegraphy, and that he heard the New York operator "O. K." the first wire at 9.50 and the second at 9.57 A. M. It was held that the customer's subsequent instructions to sell the same securities would, if the customer had full knowledge of the facts, constitute a ratification of the non-execution of the original order. The only question was whether the customer knew which telegram was first received by the brokers. The jury found for the plaintiff. The Appellate Division held that, in order to find for the plaintiff under the instructions of the court, the jury had to find that the statement of the defendants that telegram No. 1 was received after telegram No. 2 was false, and that therefore it could not be decided as a matter of law that plaintiff's direction, given in answer to that false statement, constituted a ratification of defendant's failure to sell. But the court said: "If that direction (referring to the subsequent order to sell) was sent by the plaintiff with full knowledge of all that had occurred, it seems to me that it was an adoption and ratification by him of the acts complained of. If he intended to stand upon his direction to sell at 129½, he had no business to give a direction to defendants to sell for his account, because it was for the defendants to determine for themselves how best they could protect themselves. By giving that direction and thereby inducing the defendants to sell for his account, the plaintiff must be deemed to have ratified what had previously occurred, provided he had full knowledge of it." The facts of the present case are much stronger against the appellant. Here he not only elected to take charge of the situation and give further orders for the sale of part of the stock after the failure of appellees to execute the original order to sell, but he refrained from selling some of them, speculating upon the chance of a better market. *Leviten v. Bickley* (C. C. A.) 35 F. (2d) 825; *Schmid v. Du Val,* 200 App. Div. 514, 193 N. Y. S. 278; *Burnham v. Lawson,* 118 App. Div. 389, 103 N. Y. S. 482.

Much stress is put by appellant upon the expression in some of the cases cited that ratification as between the parties depends upon an actual intention to approve the act done. In *Meyer on Stockbrokers and Stock Exchanges* it is said on page 408: "Although it is true as a general principle that ratification is based on intention and will be inferred only when the circumstances justify the inference that there was a purpose to adopt and approve, nevertheless intention is deduced from overt acts and omissions and not from secret thoughts. A customer having in fact no actual intention to ratify may nevertheless be deemed to do so if his acts are such as to be consistent only with his adoption of the wrong"—citing *Buck v. Houghtaling, supra; Manning v. Heidelbach,* 153 App. Div. 790, 138 N. Y. S. 750.

A repudiation is not effected by a statement that the sale was unauthorized (*Manning v. Heidelbach, supra; Smith v. Hutton, supra; Hopkins v. Clark, supra*), or by a claim of what the customer felt himself justly entitled to. *Smith v. Hutton, supra.*

It is significant in the matter of intention that the appellant, at the time of his interview with Mothershead immediately preceding his dealings with the stock account, made no claim upon appellees, and dealt with the stocks without notifying their representative that he intended to hold them responsible; and that after the sale of all the stocks, when called upon to pay the balance claimed by them, he did not then repudiate the liability claimed. He testified that "Mr. Mothershead sometime later, I believe it was sometime in November, called me and demanded that I pay the balance that they alleged against me in that final statement, and I made the remark to him at that time if he would adjust this Packard transaction as he agreed it should be adjusted that it would approximately make up the balance." And he further testified that, after receipt of the letter of January 6th, 1930, from the New York Stock Exchange, he was satisfied he could not press a claim as to that transaction. It is true he also testified that, after receipt of the margin call dated October 24th, 1929, he told Mothershead that he would hold

him for his negligence, but that does not seem consistent with the last-quoted testimony, nor with his conduct in taking charge of the situation on October 24th. At any rate, if he did after that tell Mothershead that he would hold him responsible, the notification came too late, if, as we hold, his taking charge on October 24th operated as a ratification.

"An act once ratified cannot subsequently be disavowed." *Meyer on Stockbrokers and Stock Exchange,* page 410.

Any suggestion that the conclusion reached improperly deprives the customer of his right to dispose of his own stock overlooks the distinction drawn in *Allen v. McConihe,* 124 N. Y. 342, 26 N. E. 812, between stock to which the customer has the legal title, and stock carried for him on margin, in which he has neither legal title nor the right of possession. In the former case he can withdraw the stock from the brokers and then, if there has been a failure by the brokers to execute an order to sell and he desires to hold them liable for resulting loss, it becomes his duty to sell promptly; and the measure of damages would be the difference between what the brokers ought to have obtained and the price obtained by the customer. In the latter, his only right until he pays for the stock is to keep up the margin, or order the stock sold. Once having ordered the sale, if there is default by the brokers in executing the order, and if he elects to hold them, his remedy is to sue for the amount which the stock should have sold for, less his indebtedness to the brokers. After default by the brokers, and pending or after his decision, he cannot give any order which would limit the opportunity of the brokers to protect themselves, without losing his right to hold them. Such interference amounts in law to ratification.

We find no error in the ruling of the court withdrawing the case from the jury, as there was no controverted fact, and all the evidence came from the plaintiff. In these circumstances it was for the court, and not the jury, to say what was the legal effect of plaintiff's conduct.

*Judgment affirmed, with costs to appellee.*