SMITH *v.* MERRITT SAVINGS AND LOAN, INC.

[No. 21, September Term, 1972.]

*Decided October 16, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Leonard E. Wilson* and *O. Robert Lidums,* with whom were *Wilson & Lidums* on the brief, for appellant.

*Melvin J. Sykes,* with whom was *William G. Kemp* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

Although many of the facts in this appeal are bizarre, there is a single question presented for our decision, *i.e.,* whether the Circuit Court for Cecil County, in Equity (Rasin, C. J.), erred in finding that the appellant, Robert Lee Smith, was bound by ratification on a mortgage for $8,500.00 to the appellee, Merritt Savings and Loan, Inc. (Merritt), executed by Mary E. Smith, the appellant's wife, in their joint names, acting, so far as Mr. Smith was concerned, upon a purported power of attorney upon which Mr. Smith's name was forged.

Mr. and Mrs. Smith were married in 1952. They purchased, as tenants by the entireties, the "home place" near North East, Maryland in 1954 for approximately $4,000.00, which was finally paid for in 1959. They have three children, aged 18, 10 and 9 years, respectively. Mr. Smith was employed by the Thiokol Corporation in Elkton. He was 39 years old at the time of trial on November 29, 1971. His formal education ceased at the end of the eleventh grade. He indicated that he could read and write "a little."

In 1965, they purchased, also as tenants by the entireties, a restaurant property, also near North East. Mrs. Smith became actively engaged in its operation between March, 1966 and June, 1967. Mr. and Mrs. Smith

had two joint bank checking accounts, subject to withdrawal by either, one in the Elkton Banking and Trust Company, the other in The First National Bank of North East. Prior to the purchase of the restaurant property, Mr. Smith had been generally responsible for the family finances and managed them in a frugal manner. An accountant was employed to keep track of the finances of the restaurant venture. Mrs. Smith was not gainfully employed during the marriage except for a six-month period when she worked for RMR Corporation which had a plant near Elkton.

The Smiths invested approximately $10,000.00 in the restaurant business of which $6,000.00 was borrowed from the Elkton Banking and Trust Company. In April, 1967, an additional $2,000.00 was borrowed from the same bank to purchase an ice cream machine. This $2,000.00 was spent but Mr. Smith testified that he did not know that it had been spent or for what; but he never received the ice cream machine.

Mr. Smith gave several explanations in regard to why the restaurant closed in July, 1967: (1) the building needed to be repaired; (2) Mrs. Smith was going into the catering business for the Thiokol Corporation because she had become friendly with Mr. Crosby, the Chairman of the Board of that corporation; and, (3) Mrs. Smith told him that Mr. Crosby had been kidnapped and this put an end to the catering portion of the restaurant business. Mr. Smith, however, stated that he had never checked to ascertain whether his wife's story about the Crosby kidnapping was true, even though, as we have stated, Mr. Smith was employed by the Thiokol Corporation.

In November, 1967, Mrs. Smith effected a fraudulent scheme to obtain money from Merritt. She applied to Merritt for an $8,500.00 mortgage loan on both the home property and the restaurant property, signing the loan application in her own name. When she appeared at the settlement without her husband, the settlement attorney, ascertaining that Mr. Smith was then living, post-

poned the settlement and prepared a power of attorney, in conventional form, from Mr. Smith to his wife. He gave this form to Mrs. Smith for execution by her husband after being told by her that Mr. Smith was very ill and could not be present at settlement. On the second date set for settlement, November 14, 1967, Mrs. Smith either forged or procured the forgery of her husband's name to the power of attorney, which specifically included a power to borrow money on real property owned by the Smiths as tenants by the entireties and to execute promissory notes, as well as to execute, acknowledge and deliver mortgages upon the real estate with the usual power of sale, assent to decree and any other provisions and covenants Mrs. Smith might deem to be proper. Mr. Smith's purported signature to the power of attorney was supposed to have been witnessed; but the signature of the alleged witness is illegible. The blank for the date of execution in November, 1967 was left blank. The power of attorney, however, appears to have been notarized on November 14, 1967, by a notary public of New Castle, Delaware, the acknowledgement reciting the personal appearance of Mr. Smith before the notary. The chancellor found—and it is not disputed—that Mr. Smith never signed or acknowledged the power of attorney.

On November 14, after the "execution" of the power of attorney, Mrs. Smith appeared at the office of the settlement attorney to complete the mortgage loan. She delivered the power of attorney, signed her name to the mortgage as attorney in fact and also signed her husband's name. The following day, November 15, the power of attorney and mortgage were duly recorded among the Land Records of Cecil County.

The mortgage was for $8,500.00, for which credit was given on the settlement sheet, dated November 14, 1967. The expenses deducted aggregated $955.35 and included a "Loan commitment fee" of $340.00 and an "Initial service charge & entrance fee" of $255.00. Both of these items were disallowed by the chancellor. Merritt not

having filed a cross-appeal, the propriety of the disallowance of these two items is not before us and we do not decide this matter.

Under the heading, "LOAN DISBURSEMENTS MADE OR TO BE MADE," appear three items, two of which are "Open taxes 347.74" and "Barnes Real Estate Co. 510.00," the latter being a "finder's fee" for the placement of the mortgage. This item was allowed by the chancellor and apparently is not in dispute before us as an allowable item. The net amount payable to the mortgagors was $6,242.65 for which a check was issued payable to "Robert L. Smith and Mary E. Smith." The settlement sheet stated that the "undersigned acknowledged the receipt of a copy of this loan settlement statement, agrees to the correctness thereof . . . and authorizes and ratifies the disbursements of the funds as stated therein." It was signed "Robert Lee Smith by Mary Elizabeth Smith" and "Mary Elizabeth Smith."

The $6,242.65 check was certified on November 16, 1967, and deposited in the joint account of the Smiths in The First National Bank of North East on the following day, November 17. The endorsement of Mr. Smith's name is obviously in the handwriting of Mrs. Smith, whose endorsement appears immediately below the purported endorsement of Mr. Smith.

After the deposit of the mortgage proceeds on November 17, strange things began to happen. Almost immediately—November 17 or 18—the Conowingo Power Company delivered at the Smith home a new refrigerator paid from the mortgage proceeds by a check drawn by Mrs. Smith on the joint account. Mr. Smith observed the refrigerator and conceded that "It looked like it was on the new side." He testified that he inquired of Mrs. Smith where it came from and that she replied that it came from Mr. Crosby, Chairman of the Board of Thiokol, who had stated to her that his wife had died leaving him with a large home and personal property he did not need and inasmuch as it was unbecoming for a man in his position to try to sell the property "to get $10 out of

a refrigerator or something like that, so he told her she could have this."

A few days later on November 20, Miller's Furniture Store of Newark, Delaware, delivered at the Smith home some $1,358.00 worth of furniture, including a sofa, a chair, a rocking chair, a dresser, a mirror and a maple chest. Shortly thereafter, the Elkton Furniture Mart delivered a $200.00 Coleman Space Heater and a $150 gun cabinet to the Smith home. Mr. Smith stated in his testimony that Mrs. Smith told him that these items came from Mr. Crosby's place. He also stated that all of these things were "junk," but later qualified this statement by saying, "Well, it might not have been junk at the time but it wasn't up to my standards, if I was going to pick stuff myself." When it was suggested to him on cross-examination that it appeared that "this wealthy man's wife, Mr. Crosby's wife, had cheap furniture, if he was chairman of the board of Thiokol," Mr. Smith replied: "Might have been. Maybe he had it in rooms that he never used."

On November 22, the Elkton Supply Company delivered a pool table to the Smith home. Mr. Smith helped to unload it and must have known where it came from. Nevertheless, he testified that as far as he knew, "it came from the same place," namely, Mr. Crosby's. There is nothing in the record to indicate that Mr. Smith ever thanked Mr. Crosby for his supposed gifts or, indeed, sought to get in touch with Mr. Crosby for any purpose.

Mrs. Smith, on November 23, returned home in a new Ford automobile which replaced the new Ford she had rented in September, 1967. She paid for the rental of this second new Ford automobile from the mortgage proceeds until December 29, 1967. According to Mr. Smith, she had this automobile because it "was an FBI car, it was bullet proof, and because my kids were in so much danger, and this, that and the other, that they would be safe riding in it, and this, that and the other, rather than they would in my Volkswagen." Mr. Smith testified that he believed this, but admitted that "some-

body holding up a large plane, or something, or taking over a whole plane, is just as far out as far as I am concerned as this is. But that is something else." Mr. Smith stated in his deposition that he believed his wife's statement that she was working for the FBI and testified at trial that he personally checked with the FBI in March, 1967 and had verified that Mrs. Smith had worked for the FBI. There is, however, no corroboration of this in the record and the FBI, in fact, had nothing to do with the automobile. $857.97 was paid from the mortgage proceeds for the automobile rental. During a three-month period, the automobiles were driven almost 6,000 miles by either Mr. or Mrs. Smith, Mr. Smith stating that he doubted that he was "in them a hundred or a hundred fifty or two hundred miles."

During the November period, Mickey Mouse watches and pendant watches for Mrs. Smith and the children were delivered at the Smith home by Colonial Jewelers. Mr. Smith was uncertain in regard to whether they came from Mr. Crosby or were presents from the FBI. A set of new dishes arrived allegedly from Mr. Crosby and a home movie outfit from Colonial Jewelers and a color TV set from Ritter Finance Company were also delivered at the Smith home.

In January, 1968, Mr. Smith was behind in the payments on his Volkswagen. Although notices were sent by the bank that his payments were overdue, Mr. Smith claimed that he never received them. The Volkswagen was repossessed in February, 1968 but Mr. Smith stated that he knew nothing of the repossession in spite of the fact that he was behind in his payments; he knew he was behind in them and one day he found that he did not have the automobile. Mrs. Smith, however, had an explanation for the absence of the car, *i.e.*, ". . . these people that was working as FBI was supposed to have used the car, they was going to catch somebody, or was going to help catch somebody with this car, with my Volkswagen, that is the way I understood it." Mrs. Smith, in fact, arranged to have the Volkswagen refinanced in

the total amount of $927.00 with the Elkton Banking and Trust Company and, to accomplish this, used the purported power of attorney on which the forged signature of Mr. Smith appeared. Mrs. Smith nevertheless denied in her testimony that she had any part in the refinancing and stated that she "wouldn't even know how to go about it." In response to a question from the chancellor, Mrs. Smith stated that although she did not know who refinanced the Volkswagen, she thought she had the reason why it was done, as follows:

> "Because I say they had to do it because they knew that Bob wouldn't let go very long having his car taken away and not brought back without going and investigating it. I say that they had to cover that up to not be found out. Because if that had been brought out in the open everything else would have been brought out in the open, way before it did, before we decided that we had just had enough, and we were going to the police in town. But when you think that you are talking to an FBI man, or talking to quite a few of them, and they have identification there, you do not go to a town officer or a sheriff when you think that you are talking to somebody that might be superior to them. You just don't do it. That is why we didn't go to one before."

In the meantime, the payments on the $8,500.00 mortgage, beginning on December 1, 1967, had not been made. The mortgagee, Merritt, mailed letters to the Smiths in due course, stating that the mortgage was in arrears and that appropriate action would be taken unless the mortgage was made current. Several people in February, 1968 told Mr. Smith that they had seen in a local paper that his property was advertised for foreclosure. He testified that he had requested Mrs. Smith to check the newspapers; and when she reported that she had found nothing, he "took her word for it" and never checked the matter himself.

During the period from November 14, 1967, to April 15, 1968, The First National Bank of North East, in regular course, mailed cancelled checks and bank statements to the Smith home; but Mr. Smith testified that he neither saw them nor made any inquiries.

About April 15, 1968, Mr. Smith, according to his testimony, first discovered the existence of the purported power of attorney and mortgage. He had finally consulted counsel after his wife had brought home a new Ford Mustang and said it was a bullet-proof automobile given to her by the FBI because the Smith children were in danger of being shot at school and the "FBI would take care of that and watch them and protect them, and so forth and so on." His counsel checked the Land Records of Cecil County and discovered the purported power of attorney and mortgage and explained to Mr. Smith that "she was allowed to work through the power of attorney and borrow money, and she did . . . ." He was told by counsel that the proceeds of the loan had been deposited in the joint checking account in The First National Bank of North East and had been used for the purchase of "rental of cars, rent-a-cars, furniture, and different things this way and that way." After being told by counsel of the various items which had been paid for in whole or in part from the joint account, Mr. Smith testified that he "did everything that I could on clearing up what I felt was there." Mrs. Smith had paid $700.00 to Miller's Furniture Store out of the joint checking account as a partial payment on account of the $1,358.00 worth of furniture delivered to the Smith home and Mr. Smith paid off the balance of over $600.00 to Miller's after he had full knowledge of all of the circumstances. In similar fashion, he paid off the balance of the rentals due on the automobiles. He also paid Colonial Jewelers the balance due on the watches over and above the amount of approximately $300.00 which Mrs. Smith had paid from the proceeds of the mortgage loan, even though Mr. Smith testified that *he* had purchased these things originally from a Mrs. Sprecher for approximately $50.00 to $75.00.

After Mr. Smith discovered all of the facts, he made no effort to restore any benefits he had received as a result of the mortgage loan. He admitted that he had most of "this furniture, the gun cabinet, the pool table, the space heater, and those things" which were delivered to the Smith home. The chancellor found as a fact that: "Mr. Smith was aware of these articles being delivered to his home and in fact most if not all of the articles are still in the home or being used by members of the family."

The bill of complaint in this case was filed on May 28, 1968, for declaratory and other relief; and it was alleged in paragraph VI that the mortgage was not his mortgage, was made without his knowledge and that "he did not receive any of the money or other consideration stated therein; . . . ." The bill of complaint prayed for a declaration that the power of attorney and the mortgage were void. Even after the opening statement of counsel for Merritt indicating its position, *i.e.*, "one, he knew or should have known this was going on, and, two, he has benefited from the results, and still is. He has his home, the pool table, watches for his children, and things of that sort. He still has benefited from it"— at no time during or after the trial did Mr. Smith offer to return the benefits received from the proceeds of the mortgage.

Mrs. Smith consulted her physician on April 17, 1968, went to Spring Grove State Hospital (a state institution for the treatment of the mentally ill) on April 18, and remained there until June 21 or 22, 1968. She denied that she participated in the obtention of the mortgage; but the chancellor found that her testimony was unworthy of belief in this regard and found as a fact that "Mrs. Smith applied for the mortgage, and she executed the mortgage. She also deposited the proceeds of the mortgage in the First National Bank of North East, Elkton Branch, and checked them out." He also found that although Mrs. Smith had been in Spring Grove State Hospital, "there was no evidence before the Court to in-

dicate that Mrs. Smith is not a competent person, and therefore for the purpose of this case the Court finds that she is competent . . . ." [1]

The chancellor concluded that, even though the power of attorney was void originally, because of the retention by Mr. Smith of the benefits of the proceeds of the mortgage loan, received and retained under circumstances which put him on notice of all of the relevant facts indicating that he was not entitled to them, "Robert Lee Smith under the peculiar circumstances of this very strange case is responsible as mortgagor under the mortgage." A decree, dated December 18, 1971, in accordance with the chancellor's opinion was filed on December 23, 1971, from which an appeal to this Court was timely entered. As we have already observed, the decree directed that the mortgagee, Merritt, credit the mortgagors, the Smiths, with $595.00, the total of the entrance fee and loan commitment fee, the propriety of which is not before us in the absence of a cross-appeal by Merritt. We, therefore, do not decide the propriety of requiring this deduction.

The law in Maryland appears to have been settled long ago. In *Maddux v. Bevan,* 39 Md. 485, 502 (1874), the Court ruled on the propriety of an attorney's settlement of a claim. Although the attorney had no express authority, the Court found there could be ratification by acceptance of the benefits.

> "But where the attorneys have not authority, if the client, after the settlement, accepts the same, or holds the fruits thereof, he is estopped from denying original authority.
>
> "He is not permitted to confirm the settlement by claiming its benefits, and repudiate the authority by which it was effected. He must either adopt or reject it—ratify the whole, or no part

---

1. The chancellor also found that inasmuch as Mrs. Smith's testimony under oath "does not square with the facts," the record should be referred to the State's Attorney's Office for investigation.

thereof. If the principal has received the proceeds, and does not disavow the acts of his agent, as soon as he can, after notice thereof, he makes them his own. There would be no justice in allowing the principal to take advantage of the acts of his agent, or attorney, as he might think proper or convenient, and yet suffer him to repudiate the authority.

"The general rule is well settled, that the ratification in part, operates to confirm the whole." *Id.* at 501-502.

This principle has been generally followed in Maryland. *Swindell v. Gilbert,* 100 Md. 399, 60 A. 102 (1905). Our predecessors recognized a Latin maxim to indicate the applicable Maryland law, *i.e., omnis ratihabitio mandato aequiparatur. National Mechanics' Bank of Baltimore v. National Bank of Baltimore,* 36 Md. 5 (1872).

This principle has been codified in the Uniform Commercial Code with respect to the ratification of an unauthorized signature of a note. *See Williams v. Johnson,* 261 Md. 463, 276 A. 2d 95 (1971).

The weight of authority supports the proposition that the principal's retention of the fruits of an unauthorized act of the agent serves as ratification of that act. *See Cohen v. Holloways', Inc.,* 158 Conn. 395, 260 A. 2d 573 (1969); *Shoolman v. Wales Mfg. Co.,* 331 Mass. 211, 118 N.E.2d 71 (1954); *In re Kroll's Estate,* 8 Misc. 2d 133, 136, 169 N.Y.S.2d 495, 500 (1957); *Yarnall v. Yorkshire Worsted Mills,* 370 Pa. 93, 87 A. 2d 192 (1952); *Commercial Credit Plan v. Beebe,* 123 Vt. 317, 187 A. 2d 502 (1963). *See also J.T. Majors & Sons, Inc. v. Lippert Bros., Inc.,* 263 F. 2d 650 (10th Cir. 1958) (dictum); Restatement (Second), *Agency* § 99 (1958); 2 C.J.S. *Agency* § 49 (1936, Supp. 1972); 3 Am. Jur. 2d *Agency* § 175 (1962, Supp. 1972).

The early English cases recognized this principle. *See, e.g., Swift v. Jewsbury,* [1874] 9 Q. B. 301, 312; *Barwick v. English Joint Stock Bank,* [1867] 2 Ex. 259.

The principle has been applied in cases involving improvements done on the wife's property, with only the husband's approval. Cases have held that the husband and wife relationship, alone, does not establish an agency; but where the wife knowingly receives benefits as the result of the husband's unauthorized action, this serves as ratification. *See Duck v. Quality Custom Homes*, 242 Md. 609, 220 A. 2d 143 (1966) ; *Wohlmuther v. Mt. Airy*, 244 Md. 321, 223 A. 2d 562 (1966) ; *Grauel v. Rohe*, 185 Md. 121, 43 A. 2d 201 (1945). *But cf. Lissau v. Smith*, 215 Md. 538, 138 A. 2d 381 (1958) where the wife's signature had been forged to a lease containing an option clause of which she had no knowledge. It was held that the wife had not ratified the unauthorized lease by receipt of the rent, such receipt being consistent with a prior oral lease of which she had knowledge.

Within this legal framework, the existence of ratification is essentially a question of fact; and unless the decision of the trier of fact in a non-jury trial is clearly erroneous, we ordinarily affirm the judgment below. Maryland Rule 886.

There are at least two reasons why the chancellor was not clearly in error in holding that, on the facts of the present case, Mr. Smith ratified the otherwise invalid and fraudulent power of attorney and mortgage.

### (1)

Mr. Smith received benefits from at least part, if not all, of the mortgage proceeds. There appears to be no question that Mr. Smith directly benefited by the payment from the mortgage proceeds of $347.74 for local taxes on the mortgaged property. In addition, certain articles of furniture, partially paid for from the mortgage payments and delivered to the Smith home, such as the gun rack and the pool table, appear to be especially adapted to Mr. Smith's enjoyment. The minimum of benefits to Mr. Smith, including taxes and car rental, paid from the mortgage proceeds appears to total $3,920.81. The chancellor found that Mr. Smith, indirectly at least,

benefited from the rental of the two automobiles by Mrs. Smith for $857.97 from the mortgage proceeds and that this amount was properly included in the "benefits" received by Mr. Smith.

It is well settled in Maryland and generally that the liability of a ratifying principal, after knowledge of all of the relevant facts, is not limited to the extent of the benefits retained by him because the principal cannot ratify a transaction in part and repudiate it as to the rest. The principal must either adopt the whole transaction or none at all. *Maddux v. Bevan, supra,* 39 Md. at 502.

As we have pointed out, there are a number of benefits resulting from the expenditure of the mortgage proceeds Mr. Smith received and retained after he had full knowledge of all of the relevant facts on April 15, 1968, and, most certainly, on May 28, 1968, when the bill of complaint was filed. Having ratified in part, he is deemed to have ratified the whole transaction.

The facts indicate that Mr. Smith had ample opportunity as well as the ability to renounce immediately the benefits of the fraud and to use them to reduce the loss of Merritt, the defrauded mortgage lender on and after April 15, 1968, when he learned all of the relevant facts. The chancellor was not clearly in error in holding Mr. Smith entirely at fault in this regard.

### (2)

Secondly, Mr. Smith did several positive acts condoning the fraud and, for this reason, was also deemed to ratify the otherwise invalid transaction. *See, e.g., Wohlmuther v. Mt. Airy, supra,* and *Grauel v. Rohe, supra. See also Wood County Bank v. King,* 141 W. Va. 226, 230, 89 S.E.2d 627, 630 (1955).

In addition to the unreturned and used benefits by Mr. Smith after discovery of all of the facts connected with the fraud, already mentioned, Mr. Smith affirmatively condoned and thus ratified the fraud against the mortgagee, Merritt, by adopting the benefits of the payments

made by Mrs. Smith from the mortgage proceeds when he—with full knowledge—performed the contracts of purchase initiated by her down payments. This conduct is a "positive act" condoning the fraud and thus ratifying the fraudulent transaction.

For these reasons, we find that the chancellor was not clearly in error in holding that Mr. Smith ratified the fraudulent transaction.

> *Decree of December 18, 1971, affirmed, the appellant to pay the costs.*