642 A.2d 309

**L. Reed HUPPMAN, et al.**

v.

**Harry V. TIGHE, et al.**

**No. 1491, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

June 9, 1994.

Nathan Braverman (Gregory M. Miller and Shapiro and Olander, P.A., on the brief) Baltimore, for appellants.

Michael B. Mann, Towson, for appellees.

Argued before BLOOM, DAVIS and MOTZ, JJ.

DAVIS, Judge.

This is an appeal from a civil jury trial held in the Circuit Court for Baltimore City. On April 11, 1990, Harry V. Tighe (appellee or Tighe), his wife Shirley Tighe, and his daughter

Patricia Stahler (collectively the "Tighe Family") filed a complaint in the circuit court against stockbroker L. Reed Huppman and Huppman's employer, Legg Mason Wood Walker, Inc. (Legg Mason). The complaint sought compensatory and punitive damages for breach of fiduciary duty, misrepresentation, negligence, and negligent supervision. Each cause of action was alleged to have arisen from Huppman's unauthorized purchase of two investments in April 1987: (1) a mutual fund on behalf of the Tighe Family and (2) an interest in a real estate limited partnership on behalf of Tighe only.

Legg Mason moved to dismiss the entire complaint. On August 2, 1990 the court granted Legg Mason's motion only as to the Tighe Family's claims for punitive damages. Thereafter Legg Mason and Huppman filed separate answers denying liability and alleging that the purchases were authorized.

Legg Mason unsuccessfully moved for summary judgment on the ground that the unauthorized purchases were ratified. On April 2, 1993, a jury trial commenced; at the conclusion of the Tighe Family's case, Huppman and Legg Mason moved for judgment on all counts. The court granted the motion only with respect to the breach of fiduciary duty and negligent supervision counts. At the close of all evidence, the court reserved ruling on defendant's motion for judgment and submitted plaintiffs' negligence and misrepresentation claims to the jury.

The jury found that both purchases resulted from negligence and misrepresentation by Huppman and Legg Mason. The jury also found that the purchase of the mutual fund was ratified, but that the purchase of the real estate partnership interest was not ratified. As damages for the purchase of the partnership interest, the jury awarded Tighe $234,426.71: $167,426.71 damages plus prejudgment interest of $66,522.71.

Huppman and Legg Mason unsuccessfully made a motion for judgment notwithstanding the verdict or alternatively for a new trial and remittitur.

Appellants, Huppman and Legg Mason, present the following issues:

I. Whether Tighe ratified his agent's unauthorized purchase of partnership units (a) by retaining the benefits of that purchase, including cash distributions and a beneficial interest in the partnership, or (b) by failing to clearly and unequivocally repudiate the transaction in a timely manner.

II. Whether Tighe's failure to offer proof of the value of the partnership interest purchased without authority, at the time of the purchase or at any time thereafter, precluded a finding that any damage was proximately caused by his agent's negligence and misrepresentation.

III. Whether the trial court abused its discretion by denying a new trial on the issue of damages when the jury's award allowed Tighe to keep the asset purchased without authority and recover all amounts expended to obtain it.

## FACTS

The genesis of this appeal is the opening of two separate accounts with the Baltimore-based investment firm of Legg Mason by Tighe.[1] The first account was opened April 6, 1987 in the name of Tighe, his wife, and his daughter (Joint Account). The next day a separate IRA account was opened in Tighe's name only. It is agreed that both accounts were non-discretionary accounts requiring customer authorization for all investments.

In early May 1987, Tighe received his monthly statement from Legg Mason, detailing his April account activity, and he realized that unauthorized transactions had been made. Regarding Tighe's IRA account, it was discovered that Huppman had purchased 8,820 units at $25 per unit—for a total consid-

---

1. At the time he invested with Legg Mason, Tighe was a 59-year-old, semi-retired certified public accountant. He has a B.S., a J.D., and a M.S.B.A degrees. He taught accounting and business law courses at the college level for several years. In addition, Tighe was an active investor; he had previously managed his own investments and had been a member of an investment club since 1952.

eration of $220,500—of Mid–Atlantic Centers (MAC), a Maryland limited partnership that was formed in 1986 for the purpose of investing in shopping centers in the mid-Atlantic region. Tighe was incensed and immediately telephoned Huppman and "asked him using a few expletives what right [Huppman] had to purchase that security without [Tighe's] permission." Huppman offered to explain the situation at Tighe's home. When Huppman arrived, Tighe advised him that he did not want the MAC investment; he wanted the $220,500 returned to the account and, if not, he would bring legal action.

The parties portray in severe contrast the events that immediately followed the telephone conversation. Appellants suggest that Tighe was persuaded to hold the MAC investment; in essence, Tighe was waiting to see how well the investment performed. Tighe, on the other hand, contended at trial that he clearly repudiated the MAC purchase and that he was forced by Huppman to wait until the MAC units were marketable before he could secure the full return of his money plus fair interest for the opportunity cost of his funds. Moreover, Tighe contends that he accepted the dividend checks from MAC because he viewed that money as the beginning of Huppman's restoration of his account with fair interest. We provide the pertinent portion of Tighe's trial testimony:

[By Michael B. Mann, counsel for Appellees]:

Q. Okay. And what happened when he came to your house?

A. Uh—we went downstairs to discuss the statement and I told .him ... that under no circumstances will I accept that and that I wanted the money returned to my account.

Q. What was his response to that?

A. He said to please calm down and that it was a good investment and that ... I should hold on to it. Uh—that it was the flagship of the Legg Mason investment fleet. From his description, it was gold-plated. I told him I did

not care. I did not want the investment. I wanted the money restored to my account.

Q. And what did he say to that?

A. Well, I—when I said the money restored to my account the second time I said, and if this does not happen, I will take legal action and he said, "well look. Before you take legal action, will you please consider the fact that Legg Mason is in the process of having this fund ... presented on a unit basis with a market value,"—

Q. What did that—

A. —and that they expected it to be marketable and [it] was certainly going to be valuable.

Q. What did that mean to you, presented on a unit basis and have market value?

A. It meant that instead of being a—an investment that you were tied up with and could do nothing with, it would be an investment that could be marketed—

Q. Okay. What—

A. And your money could—could be gotten out of it.

Q. What was your understanding or what did he tell you about whether you could sell that investment right then and there ...

A. He assured me—he guaranteed me—

. . . .

Q. What ... did he tell you about whether you could sell that investment right at that time?

A. He ... didn't—he knew it couldn't be sold then. He was .. trying to get me to consider holding off legal action until I gave Legg Mason a chance to put this security on a unit basis and create a market value.

Regarding the Joint Account, Tighe testified that, upon reviewing a separate monthly statement, he learned that on April 14, 1987 Huppman had purchased 15,399 shares of MFS Lifetime Capital Growth Fund (MFS). Tighe confronted Huppman about the MFS purchase at the same time they discussed the MAC investment. The record indicates that the

money was not restored to Tighe's account, and that Tighe sold MFS at a loss in February 1989. During the period Tighe held MFS, he received and retained dividends and capital gains distributions from MFS totalling $2,399. The jury concluded that Tighe ratified the MFS purchase. The jury's findings regarding the MFS purchase were not appealed.

Despite the unauthorized purchases, Tighe did not close his accounts at Legg Mason but, rather, continued to purchase securities through Huppman for nearly two years. After learning about Huppman's transgressions, there is no record that Tighe spoke to Huppman's superiors. Tighe did, however, testify that he was told by an unidentified person to speak only with Huppman. In addition, Tighe contacted MAC directly in August 1987 "to get a schedule of expected income and capital distributions by quarters" and "to try to find out how [he] could get his money back and when." This information would allegedly "enter into [his] decision to make a legal ... suit sooner than later." Tighe acknowledged having received the MAC prospectus on or about August 14, 1987. Although it is uncertain as to how much of the prospectus Tighe read, the cover reads, *inter alia:*

> There currently is no public market for the Units, and there can be no assurance that the Units will be listed or, if listed, that a public market will develop, particularly in view of the size of the minimum offering.

In May 1989 Tighe called Legg Mason to speak with a compliance officer. Tighe followed up with a letter recapping the substance of his conversation with the compliance officer. In the letter Tighe repeatedly complained about the unauthorized purchase of MAC and the lack of any market for its sale. Nonetheless, Tighe did not state outright that he wanted MAC removed from his account and replaced with his original funds and fair interest.

On August 17, 1987, after Tighe received the MAC prospectus, MAC began making quarterly distributions of partnership cash flow to its limited partners. Between August 1987 and

the date of Tighe's May 1989 letter to Legg Mason, Tighe received four cash distributions totalling $14,670.60. In total, Tighe received fourteen separate cash distributions totalling $52,596.60 before MAC ceased making distributions to its limited partners. At Tighe's request, all of these distributions were deposited into Tighe's money market account at Legg Mason. Tighe testified that he retained the distributions because he believed "they were part of the return of capital that [he] had requested," presumably the return on his $220,-500 used to purchase the MAC units plus a "fair rate of return."

## LEGAL ANALYSIS

Appellants ask this Court to overturn a jury verdict concluding that Tighe repudiated and did not ratify Huppman's unauthorized purchase of the MAC investment. The jury's finding that the purchase was not authorized is not challenged.

 A motion for judgment notwithstanding the verdict (j.n.o.v.) is reviewed under the same standard as a judgment granted on motion during trial. The appellate court assumes the truth of all credible evidence and all inferences of fact reasonably deducible from the evidence supporting the party opposing the motion. If there exists any legally competent evidence, however slight, from which the jury could have found as they did, a j.n.o.v. would be improper. *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 327, 389 A.2d 887 (1978); *Lakewood Eng'g. & Mfg. v. Quinn,* 91 Md.App. 375, 381, 604 A.2d 535 (1992); *DiLeo v. Nugent,* 88 Md.App. 59, 75, 592 A.2d 1126, *cert. granted,* 325 Md. 18, 599 A.2d 90 (1991).

## I

In the case *sub judice,* appellants suggest that there was no legally competent evidence to support the jury's finding that Tighe (a) repudiated the unauthorized purchase and (b) did not ratify the unauthorized purchase.

a

■ Maryland law is clear that "a repudiation is not effected by a statement that the sale [or purchase] was unauthorized or by a claim of what the customer felt himself justly entitled to." *Hathcock v. Mackubin,* 166 Md. 70, 81, 170 A. 573 (1934) (internal citations removed); *see also Smith v. Merritt Sav. & Loan,* 266 Md. 526, 536–37, 295 A.2d 474 (1972). A repudiation must be made timely, *id.,* and in a definite, positive, and unequivocal manner. *Shapiro v. Bache & Co., Inc.,* 116 Ariz. 325, 569 P.2d 267, 271 (Ariz.Ct.App. 1977). *See also* 3 C.J.S. *Agency* § 402(C) (1973). The sufficiency of a repudiation is generally a question of fact that must be determined from the surrounding circumstances. *Smith,* 266 Md. at 538, 295 A.2d 474; 3 C.J.S. *Agency* § 402(c). It is only where the "case is so clear that reasonable [minds] could come to but one conclusion" that repudiation may be determined as a matter of law. RESTATEMENT (SECOND) OF AGENCY § 94 cmt. a (1957).

■ Based on the foregoing principles, we affirm the trial court's decision not to grant a j.n.o.v. as to the issue of repudiation. Tighe's testimony amounts to legally competent evidence sufficient for the jury to conclude that Tighe repudiated the unauthorized MAC purchase. We restate the pertinent portion of Tighe's testimony:

Q. Okay. And what happened when he came to your house?

A. Uh—we went downstairs to discuss the statement . . . I told him . . . that under no circumstances will I accept that and that I wanted the money returned to my account.

Q. What was his response to that?

A. He said to please calm down and that it was a good investment and that . . . I told him I did not care. I did not want the investment. I wanted the money restored to my account.

This testimony constitutes evidence sufficient for a jury to conclude, drawing all inferences in Tighe's favor, that he made a definite, positive, and unequivocal repudiation.

**b**

Having ruled that the trial court did not err with respect to the determination that Tighe repudiated the MAC purchase, we next consider whether the trial court should have held that Tighe ratified the MAC purchase as a matter of law.

 A principal will be bound by the unauthorized acts of his agent if the transaction is ratified in whole or in part. *Smith,* 266 Md. at 536–37, 295 A.2d 474. The burden is on the broker to prove ratification. *Richardson Greenshields Sec., Inc. v. Lau,* 819 F.Supp. 1246, 1259 (S.D.N.Y.1993). Nonetheless, if the broker can show that the customer was aware of the controverted trade, the customer is obligated to show that this knowledge did not rise to the level of ratification. *Id.* Moreover, it is a general rule of agency law that a principal who, with knowledge of the material facts surrounding his agent's unauthorized act, receives and retains the benefits of the unauthorized act has ratified the act. *Smith,* 266 Md. at 537, 295 A.2d 474.

The authorities are crystal clear that a party cannot be found to have ratified, absent knowledge of the material facts undergirding the transaction. *Lissau v. Smith,* 215 Md. 538, 546, 138 A.2d 381 (1958) ("[t]he law does not infer ratification from receipt of benefits unless there is a full knowledge of the facts of the transaction"); *Myers v. Shipley,* 140 Md. 380, 393, 116 A. 645 (1922) ("if a person ratifies an act of his agent before he knows the material facts, he may afterwards disaffirm"); *Richardson,* 819 F.Supp. at 1259; *see also* 3 Am. Jur.2d *Agency* § 189 (1986); 2A C.J.S. *Agency* § 73 (1972); RESTATEMENT, *supra,* § 99.

 Although the general rule looks at the principal's intent from an objective perspective and it accordingly applies regardless of the principal's actual intent, notwithstanding protestations or expressions of disapproval of the agent's

unauthorized act, the rule is not without limitations. It is not applicable where the circumstances surrounding receipt of a benefit do not reasonably tend to show an intention to ratify, or where the circumstances indicate that receipt of the benefits are as consistent with an intent to ratify as an intent not to ratify. *Phoenix Western Holding Corp. v. Gleeson,* 18 Ariz.App. 60, 500 P.2d 320, 328 (Ariz.Ct.App.1972); 2A C.J.S. *Agency* § 86(b). *See also Richardson,* 819 F.Supp. at 1259 ("[t]he doctrine of ratification prohibits the customer from disavowing unauthorized trading in his or her account when 'it is clear from all circumstances that the *intent* of the customer was to adopt as his own and for all times the trades executed for his account without authorization.' ").

We affirm the trial court's ruling because the record provides sufficient evidence for a jury to have found that Tighe was not made aware of the material facts of the unauthorized transaction. Tighe's testimony reasonably infers that Huppman was intentionally misleading Tighe into believing that he could not get his money returned immediately because there was no market in which to sell the MAC investment. Thus, Tighe would have no choice but to hold on to the MAC investment until appellants could sell them. In contrast, appellants' brief states:

It is significant that the MAC public offering was ongoing in August of 1987.[2] The offering was successful, resulting in sales of twice the number of partnership units initially authorized.[3] The evidence thus indicated that had Tighe unequivocally repudiated the transaction, Legg Mason would have been able to resell the units at full price and minimize its loss. Tighe's failure to repudiate the transac-

---

2. Appellants rely on a portion of MAC's 1992 Securities and Exchange Commission filing (Form 10–K), which states that the "Partnership completed its public offering Units on November 11, 1987." Thus, appellants are slightly inaccurate, the public offering lasted even longer than they stated.

3. The MAC prospectus dated March 25, 1987, states that 600,000 Units will be offered and the 1992 Securities and Exchange Commission filing states that 1,200,000 Units were subscribed.

tion at that point, therefore, permitted Tighe to 'speculate at the broker's expense,' precisely the situation the doctrine serves to prevent....

If Huppman could have expeditiously sold the MAC investment, he kept this information from Tighe. Thus, Tighe did not have all of the material facts undergirding the unauthorized transaction and could not have ratified the purchase.

In this regard, we are persuaded by the reasoning followed in *Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng,* 901 F.2d 1124 (D.C.Cir.1990). In that case, the Chengs opened a non-discretionary account with Grace, a Merrill Lynch broker. Dr. Cheng, who had previously purchased IBM stock options, telephoned Grace on the day in question and ordered that Grace purchase additional options, but "only if his account could afford it." *Id.* at 1126. Based on incorrect accounting information, Grace overbought the Chengs' account. Grace called the Chengs and advised them of the mistake. Instead of informing the Chengs that they had the right to reject the unauthorized transaction, Grace told them:

"Look, we still like IBM. We still think IBM is going to do well. There are two things we can do. We can sell out of these things or you can go ahead and keep the positions and send money in."

*Id.* Thus, the Court found that the Chengs were given two choices: either sell the options (now at a loss) or pay the $119,000 debit and hope the price rises. If neither option was chosen, Merrill Lynch would liquidate the account. *Id.*

Affirming the trial court's order granting a directed verdict in favor of the Chengs, the appellate court held that agency principles required Grace and Merrill Lynch to inform the Chengs of their right to reject the unauthorized options, and that because the Chengs were not advised of their right to reject the unauthorized trades, as a matter of law, there could not have been a ratification. *Id.* at 1127–29.

The Court's analysis began with the distinction between "nondiscretionary" and "discretionary" accounts. The customer must give prior approval of all transactions involving a

nondiscretionary account, but with respect to a discretionary account the broker determines which investments to make and carries out the transactions without prior authorization. Based on this distinction, many courts have held that a broker handling a discretionary account has a fiduciary duty to his client, but not a broker handling a non-discretionary account. The Court then made it clear that it was not passing judgment on that issue, but would rely solely on principles of agency law. *Id.* at 1128.

Based on agency law, the Court divined the following principles: A broker is an agent who owes his principal a duty to act only as authorized. As an agent, he/she must act in the principal's best interest and has a duty to give his/her principal information that is relevant to the affairs entrusted to the agent. This obligation becomes enhanced under circumstances where the agent develops an interest inconsistent with that of the principal. Thus, the Court concluded that Grace and Merrill Lynch breached their duty to inform the Chengs of their right to disavow the unauthorized trades. *Id.* at 1128–29 (citing cases).

Finally, the Court rejected the argument that because Dr. Cheng was a sophisticated investor who was aware of all of his choices the evidence manifested only that Dr. Cheng voluntarily chose to ratify the trades involved. Relying on the well-settled principle that ratification occurs only when the customer, with full knowledge of the facts, manifests his intention to adopt the unauthorized transaction, the Court held that the Chengs were not advised of their right to reject the unauthorized trades and therefore, as a matter of law, could not have ratified the trades. *Id.* at 1129.

In the case *sub judice*, regardless of appellants' failure to advise Tighe of his right to repudiate the unauthorized purchase, Tighe did repudiate the purchase. Appellants did not, however, inform Tighe that they could sell the MAC investments and return his account balance; but, rather Huppman urged Tighe to hold on to the MAC investment until it became marketable at some future date. This was at best an overly

optimistic prediction according to the prospectus and at worst misinformation. A jury examining these facts in a light most favorable to Tighe could find that Huppman was intentionally misleading Tighe and did not want Tighe to know that the MAC investment could be sold by Huppman and Legg Mason. Based on such a reasonable finding, as a matter of law, ratification could not have occurred—at the very least until such time as Tighe was apprised of the prospects for true marketability of the MAC units.

## II

Appellants' next contention is that, because Tighe elected to pursue damages rather than recision, the appropriate measure of damages is the difference between the value of the assets received and the value of the assets had there been no misrepresentation. Thus, the trial court erred in permitting the jury to award damages that permitted Tighe to recover fully the amount incurred to purchase MAC units.

This argument fails for a very simple reason. Tighe repudiated and never ratified the unauthorized purchase. Thus, there was no authorized purchase and no liability created on behalf of Tighe. 3 C.J.S. *Agency* § 404. It would be unreasonable for Tighe to be forced to own and sell at his own expense the MAC investment he never authorized.

In *Hathcock,* 166 Md. at 82, a customer was found to have ratified a broker's failure to sell his stock because the customer sold the stock without first making an effective repudiation. The customer suggested to the court that its ruling would deprive him of his right to dispose of his own stock. In reply, the Court stated:

> Once having ordered the sale [of stock purchased on margin], if there is default by the stockbroker in executing this order, and if he elects to hold them, his remedy is to sue for the amount which the stock should have sold for, less his indebtedness [the margin] to the broker. After default by the broker, and pending or after his decision, he cannot give any order which would limit the opportunity of the brokers

to protect themselves, without losing his right to hold them. Such inference amounts in law to ratification.

Although *Hathcock* addressed a failure to sell rather than an unauthorized purchase, it makes the pertinent point that a principal who repudiates an unauthorized act has no liability for that act. The principal's remedy is to be put back in the position that he would have been had the agent acted as authorized or directed. In *Hathcock*, that meant that the customer (had he not ratified) would have been entitled to the difference between what the stock would have sold for at the time he ordered its sale and the amount the stock was originally purchased for on margin. The customer had no authority to instruct the broker subsequently when to sell or what to do with the stock; the customer's damages were established at the very moment the broker breached his duty to sell. *Id.* Concomitantly, in the case *sub judice*, Tighe's damages were established at the very moment the unauthorized purchase was made and $220,500 was no longer at his disposal. Tighe never ratified the purchase and therefore could not instruct appellants what to do with the MAC units, except to suggest that they remove them from his account. Indeed, an assertion of ownership or control would be inconsistent with Tighe's repudiation.

## III

Appellants' final argument is that the trial court abused its discretion by permitting Tighe to recover the full purchase price of the MAC units while retaining the units. The objective of an award of compensatory damages is to make the plaintiff whole by monetary compensation. *Exxon Corp. v. Yarema*, 69 Md.App. 124, 137, 516 A.2d 990 (1986), *cert. denied*, 309 Md. 47, 522 A.2d 392 (1987).

In response, the Tighe Family underscores what it views as the irony of appellants' claim of error: at first, appellants would not remove the MAC units from Tighe's account; at trial they never asked for it back; and now they want the MAC units. While we agree that this is somewhat ironic, we

believe that Tighe's repudiation of the purchase destroyed any legal entitlement and liability that appellants intended to create. Therefore, Tighe has no legal rights to the MAC units. Continued retention of the MAC units is in direct conflict with Tighe's repudiation. *See Smith,* 266 Md. at 537, 295 A.2d 474; RESTATEMENT, *supra,* § 99. Moreover, during oral argument, Tighe's counsel expressly conceded that Tighe has no ownership rights or interest in the MAC units that are still carried by Legg Mason on Tighe's account.[4]

As a third alternative to their request for a judgment notwithstanding the verdict or a new trial, appellants sought a remittitur of $115,542, the value of the MAC units, which they continue to believe still belong to Tighe. Since the units do not belong to Tighe and Legg Mason has full control over them, remittitur was totally inappropriate.

**JUDGMENT AFFIRMED. COST TO BE PAID BY AP-PELLANTS.**

---

4. Given Tighe's repudiation, the responsibility to correct the unauthorized purchase rested on Huppman and Legg Mason who simply had to restore the funds improperly expended to Tighe's account. There was no certificate or other indicia of ownership, the possession of which would show Tighe continued to retain the interest in the real estate partnership.